## NASHVILLE WAREHOUSE & ELEVATOR CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7870.

Circuit Court of Appeals, Sixth Circuit.
June 28, 1939.

Llewellyn A. Luce, of Washington, D. C. (Llewellyn A. Luce, of Washington, D. C., on the brief), for petitioner.

John J. Pringle, Jr., Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key and John J. Pringle, Jr., Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before ALLEN, HAMILTON, and ARANT, Circuit Judges.

ALLEN, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals determining deficiency in petitioner's income tax for the fiscal year ended June 30, 1931, in the amount of $7,143.10. The Commissioner had determined a deficiency of $11,978.92, but certain items were adjusted and corrected in the proceedings before the Board, and the only question in controversy here concerns the gain determined to have arisen from a reorganization between two corporations organized and owned by petitioner. The decision of this question in turn involves the cost to the petitioner of certain stock in the Indianapolis Public Elevator Realty Company, which stock petitioner exchanged for stock in the Indianapolis Public Elevator Corporation.

The pertinent facts as found by the Board are in substance as follows:

In June, 1928, petitioner acquired certain elevator property in Indianapolis, Indiana, and established a branch of its business there. The property consisted of 3½ acres of land, concrete storage elevators and a wooden head house. The purchase price was $40,000, of which $12,733.67 was paid in cash. On November 3, 1928, the property was destroyed by fire, and petitioner collected fire insurance thereon in the amount of $41,000. From the proceeds the amount remaining due on the purchase price was paid. The remainder was carried into the funds of the branch office.

On January 1, 1929, the petitioner organized the Indianapolis Public Elevator Realty Company, herein referred to as the Realty Company, under the laws of Indiana and transferred the Indianapolis property to it in exchange for its common stock amounting to 750 shares with a par value of $100 per share. The Realty Company, by its charter, was authorized to issue preferred stock having an aggregate par value of $150,000. It entered into an agreement with the Peoples State Bank of Indianapolis for the underwriting of this issue of preferred stock and received therefor the sum of $140,000. On March 30, 1929, the petitioner and the Realty Company entered into an agreement whereby the Indianapolis property was leased to the petitioner for the period from February 15, 1929, to February 14, 1930, and so much longer as any of the preferred stock remained outstanding. Under the terms of this instrument the petitioner agreed to pay as rental for the premises an amount sufficient to pay the dividends on preferred stock from year to year, all taxes and municipal assessments, all insurance premiums, amounts sufficient to retire preferred stock at the rate of $12,000 per year for a period of five years, after that $15,000 per year for four years and the remaining $30,000 the following year, and all other reasonable costs, charges and expenses of the lessor incident to the ownership, care and upkeep of the premises.

On April 12, 1929, a further agreement was executed by the petitioner and the Realty Company whereby the petitioner agreed to restore the damaged property to its normal condition and to erect new bins and storage tanks, together with the necessary structures to house machinery required for the operation of the plant. For this work the Realty Company agreed to pay the petitioner the sum of $140,000.

The petitioner proceeded with the work, and, upon completion of the plant, assumed the operation of the Indianapolis Public Elevator as a branch of its business. The total cost of restoring the old premises and erecting the new units amounted to $189,261.93.

In 1930, the petitioner was advised that under Indiana law the operation of public elevators had been held to be the function of a public service corporation and that the operator of such elevators must be organized under the laws of Indiana. Accordingly, on October 28, 1930, the Indianapolis Public Elevator Corporation (hereinafter referred to as the Elevator Corporation) was organized under the laws of Indiana to take over the elevator business formerly carried on by the Indianapolis branch of the petitioner. The authorized capital stock of the Elevator Corporation was 1,000 shares of common stock having a par value of $100 per share.

Under the terms of the subscription contract executed on October 27, 1930, by and between the petitioner and five individuals who were to serve as directors, the petitioner was to receive 995 shares of the 1,000 shares of common stock authorized and the remaining five shares were to be used as qualifying shares for directors. By the terms of this contract, the Elevator Corporation was to issue its stock and to assume the liabilities of the petitioner's Indianapolis branch in return for the 750 shares of common stock in the Realty Company owned by the petitioner, and all of the assets of the business conducted by the petitioner's Indianapolis branch, including all cash in the bank and bills receivable, the same to be not less than the fair gross value of $30,000. It was also provided that the outstanding liabilities assumed should not exceed the total sum of $60,000 and should include all outstanding warehouse receipts issued on or after August 22, 1929. It was contemplated that the assets to be transferred should be fairly worth $160,000 and the liabilities not to exceed $60,000. On November 13, 1930, the lease held by petitioner to the elevator property was duly assigned to the Elevator Corporation.

In addition to the 995 shares of Elevator Corporation stock received by the petitioner for its stock in the Realty Company and its warehouse business at Indianapolis, the petitioner received a promissory note of the Elevator Corporation in the amount of $60,198.10, to cover the balance of the advances which had been made to the Indianapolis branch from the period beginning July 11, 1928. The note was payable one year from date with interest at seven per cent. and was paid prior to the end of the taxable year. The stock of the Elevator Corporation had a fair market value on the date of exchange of $50 per share. This stock was transferred direct to the petitioner's stockholders but the note and its proceeds were received by the petitioner and were not distributed.

Petitioner reported a loss of $22,053.97 from the transaction. The Commissioner determined a taxable profit of $57,672.59.

The Board held that the transaction was a reorganization under § 112(i) of the Revenue Act of 1928, 45 Stat. 791, 26 U.S.C.A. § 112 note, and that under § 112(d) the profit on the exchange was limited to $60,198.10. Petitioner contended that the cost to it of the Elevator Corporation stock was $189,261.93. The Board decided that the basis for determining gain or loss was the cost to petitioner of the property exchanged, and found that the cost was $72,931.77. It arrived at this figure by adding the amount of down payment on the elevator properties, namely, $12,733.67 to the amount of $69,198.10, which was the cost of the business as measured by the sums advanced by petitioner to the Realty Company. While the Board found that the purchase price of the property was $40,000, it refused to allow as cost $27,266.33 of this amount, for the reason that this sum was paid from insurance proceeds recovered when the property was destroyed by fire in 1928. The Board also refused to consider as cost the sum of $189,261.93 expended by petitioner under the contract with the Realty Company in improving the property, erecting new elevators, and restoring damaged property following the fire in 1928.

The case arises under the following sections of the Revenue Act of 1928:

§ 112(a). "Upon the sale or exchange of property the entire amount of the gain or loss determined under section 111, shall be recognized, except as hereinafter provided in this section."

"(b)(4) No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization."

"(d) If an exchange would be within the provisions of subsection (b)(4) of this section if it were not for the fact that the property received in exchange consists not only of stock or securities permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then—

"(1) If the corporation receiving such other property or money distributes it in pursuance of the plan of reorganization, no gain to the corporation shall be recognized from the exchange, but

"(2) If the corporation receiving such other property or money does not distribute it in pursuance of the plan of reorganiza-

tion, the gain, if any, to the corporation shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property so received, which is not so distributed."

§ 113(a). "The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property. * * *" 26 U.S.C.A. §§ 112(a), (b)(4), (d) (1, 2), 112 note, 113 note.

The petitioner claims that the Board erred in two particulars: (1) In failing to allow petitioner as cost of its Indianapolis properties the entire purchase price of the property; (2) in failing to allow the cost of restoration after the fire as part of the cost of the Indianapolis property.

■ The first contention must be sustained. The purchase price was $40,000, but the Board allowed only $12,733.67 as net cost to the petitioner, upon the ground that the balance over and above the cash down payment was paid from insurance proceeds recovered when the property was destroyed by fire. Obviously the full item should be included in figuring the cost of the property. Whatever the source of the funds from which payment was made, the cost was $40,000.

■ The second contention has no merit. The cost of restoration was shown to be $189,261.93. The petitioner contracted with the Realty Company that it would erect new bins and storage tanks, and restore the property for $140,000, to be paid to it by the Realty Company. The Realty Company negotiated with the bank for underwriting its preferred stock and received therefor $140,000. It is not shown that this sum was not paid to petitioner, and petitioner's vice president and treasurer states that this sum is included in the $189,261.93. This amount clearly cannot be calculated as part of the cost. With reference to the balance of $49,261.93 of the cost of restoration borne by petitioner, the Board made this finding:

"An examination of the account showing transmittals by the petitioner to its branch office in Indianapolis and the construction account of the branch office indicates that at least a portion of the excess over the $140,000 expended by the petitioner in rebuilding the Indianapolis property was reflected in the net balance of its transmittals to its branch office as of the

date of exchange which in turn was covered by the note in the amount of $60,198.-10."

The burden was on the petitioner to show that the Board's finding is incorrect. This burden it has not sustained.

The Board erred in failing to include in the cost figure the total purchase price of $40,000, but in other respects its decision was not erroneous. The decision is reversed and the case is remanded for further proceedings not inconsistent with this opinion.