## ARUNDEL–BROOKS CONCRETE CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4939.

Circuit Court of Appeals, Fourth Circuit.

July 30, 1942.

William S. Hammers, of Washington, D. C., for petitioner.

Newton K. Fox, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, J. Louis Monarch and S. Dee Hanson, Sp. Assts. to the Atty. Gen. on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a petition for the review of a decision of the United States Board of Tax Appeals determining a deficiency in petitioner's income and excess profits taxes for the calendar year 1937 in the amounts of $199.44 and $60.77, respectively. The opinion of the Board, entered on December 29, 1941, is reported in 45 B.T.A. 178. The single question now before us is an interpretation of the word *"cost"* as a basis for computing depreciation deductions under sections 23(*l*), 113(a) and (b) (1) (A), and 114(a) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, pages 829, 859, 865, 866.

The instant controversy stems from the erection of a new concrete mixing plant by the petitioner in 1937 at Sparrows Point, Maryland, and the relation borne to it by the petitioner, the Bethlehem Steel Company, the Maryland Slag Company, and the Arundel Corporation. The Bethlehem Steel Company operates a number of blast furnaces at its plant in Sparrows Point, Maryland. The Maryland Slag Company, engaged in the processing and marketing of slag produced by blast furnaces, entered into an agreement with the Bethlehem Steel Company on February 23, 1936, whereby it obtained the exclusive right for a period of 15 years thereafter to remove slag from the plant of Bethlehem Steel at Sparrows Point. This arrangement was then superseded by a new agreement executed on January 1, 1938, which limited this right to the period beginning January 1, 1938, and ending December 31, 1945.

In January, 1937, Bethlehem Steel had a demand for a large quantity of concrete for construction work. Accordingly, petitioner agreed to erect and place in operation within 60 days a concrete mixing plant on property of Bethlehem Steel adjacent to the Maryland Slag Company, from which processed slag for coarse aggregate was to be obtained and used in the concrete. Bethlehem Steel was to furnish the necessary land for the plant without cost to the petitioner, to construct the trackage, aggregate pits and water lines, and to provide free water and sand at $1.00 per ton. The Maryland Slag Company agreed on its part, to furnish in their side dump pits at 90 cents per ton, slag of such gradation as would be required by the petitioner. Finally the minutes of a special meeting of the board of directors of the Maryland Slag Company held on January 6, 1937, reveal that: "* * * on motion properly seconded and carried, this Company agreed to *contribute* $12,500.00 to the Arundel-Brooks Concrete Corporation, toward the cost of erecting a slag concrete plant." (Italics ours.)

The plant was erected in due course by petitioner at a total cost of $39,766.13. Operation of it was begun by April 30, 1937. On May 17, 1937, the board of directors of Maryland Slag Company discussed a suggestion that it participate in the cost of erecting the plant to an extent greater than its original tender of $12,500. The minutes of this meeting also indicate some difference of opinion at that time as to whether the amount to be advanced would be returned ultimately. The following extract is taken from the minutes of a meeting of the board of directors of the Maryland Slag Company on June 14, 1937:

"The Treasurer referred to the discussion in our previous meeting regarding the plant of the Arundel-Brooks Concrete Corporation, which was erected at Sparrows Point, and submitted information substantiating the expenditure by the Arundel-Brooks Concrete Corporation, of nearly $43,000.00 for the erection of this plant with the suggestion that apportionment be made on the basis of $40,000.00. After further discussion Mr. Bliss offered the following resolution:

"Resolved that this corporation (The Maryland Slag Company) assume fifty per cent of $40,000.00, namely, $20,000.00 as its proportion of the cost of erecting a premixed concrete plant on the area allotted to us by the Bethlehem Steel Company at Sparrows Point, Md., in consideration of the fact that this plant will produce premixed concrete using slag for coarse aggregate, and

"Resolved Further that the Treasurer be authorized to accept a bill for $20,000.00 from the Arundel-Brooks Concrete Corporation. This sum to be liquidated on the basis of $2,000.00 per annum, with the privilege of anticipation at any time, and

"Resolved Further, that in the event we are unsuccessful in securing a five year extension to our contract with the Bethlehem Steel Company, any balance due the Arundel-Brooks Concrete Corporation, is to be paid prior to the termination of our agreement with the Bethlehem Steel Company."

On June 30, 1937, petitioner submitted to the Maryland Slag Company a bill for $20,000.00 as the Slag Company's share in the cost of the plant. This sum was paid by Maryland Slag to petitioner by check on December 10, 1937. On the books of the petitioner, the $20,000.00 thus received was at first credited to the account representing the cost of the new plant. A readjustment was made at a later date, however, in which the sum was credited to surplus. Finally, it should be noted that during the calendar year 1937 the Arundel Corporation of Baltimore, Maryland, owned all of petitioner's outstanding stock. The Maryland Slag Company had no sales organization of its own and its products were sold to and marketed by the Arundel Corporation, which also owned 25 per cent of

the outstanding stock of the Maryland Slag Company. Moreover the board of directors of Maryland Slag was composed of 6 persons, 2 of whom were also directors of Arundel Corporation. On the other hand, petitioner's board of directors consisted of 5 individuals, 2 of whom were also directors of Arundel Corporation.

Petitioner, in determining its income and excess profits tax liability for the calendar year 1937 used the total cost of the plant, namely, $39,766.13, in computing a depreciation deduction. The Commissioner of Internal Revenue redetermined this tax liability by disallowing as a deduction the amount of depreciation applicable to $20,-000. The Commissioner stated that this amount, received from Maryland Slag, constituted a reimbursement of a capital expenditure and represented a reduction in the depreciation basis of the plant.

The Board affirmed the action of the Commissioner in reducing the depreciable base of the plant from $39,766.13 to $19,-766.13 on the theory that the contribution of $20,000.00 did not constitute a gift from Maryland Slag to petitioner but rather constituted in effect, its own investment of that sum in the plant. From this decision, petitioner has duly taken an appeal.

The relevant provisions of the Revenue Act of 1936 and appropriate Treasury Regulations are as follows:

"§ 23. *Deductions from Gross Income*

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(1) *Depreciation.* A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. \* \* \*

\* \* \* \* \*

"(n) *Basis for Depreciation and Depletion.* The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114.

\* \* \* \* \*

"§ 113. Adjusted basis for determining gain or loss

"(a) *Basis (unadjusted) of property.* The basis of property shall be the cost of such property; except that—

\* \* \* \* \*

"(2) *Gifts after December 31, 1920.* If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except that for the purpose of determining loss the basis shall be the basis so determined or the fair market value of the property at the time of the gift, whichever is lower. \* \* \*

\* \* \* \* \*

"(b) *Adjusted basis.* The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

"(1) *General rule.* Proper adjustment in respect of property shall in all cases be made—

"(A) for expenditures, receipts, losses, or other items, properly chargeable to capital account, including taxes and other carrying charges on unimproved and unproductive real property, but no such adjustment shall be made for taxes or other carrying charges for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years; \* \* \*.

\* \* \* \* \*

"§ 114. Basis for Depreciation and Depletion.

"(a) *Basis for depreciation.* The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property.

\* \* \* \* \*".

Treasury Regulations 94, promulgated under the Revenue Act of 1936:

"Art. 23 (1)-1. *Depreciation.*—A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence. The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage

value, will, at the end of the useful life of the property in the business, *equal the cost or other basis of the property determined in accordance with section 113.* * * *

* * * * *

"Art. 23 (1)-4. *Capital sum recoverable through depreciation allowances.*—The capital sum to be replaced by depreciation allowances is *the cost or other basis of the property in respect of which the allowance is made.* (See sections 113(a) and 114.) * * *

"Art. 113 (a)-1. *Scope of basis for determining gain or loss.*—The basis of property for the purpose of determining gain or loss from the sale or other disposition thereof is the unadjusted basis prescribed in section 113 (a), adjusted for the various applicable items specified in section 113 (b). Unless otherwise indicated, the word 'basis,' as used in this article and articles 113 (a)-2 to 113 (a) (16)-1, inclusive, has reference to the unadjusted basis.

"Art. 113 (a)-2. *General rule.*—In general, the basis of property is the cost thereof.* * * *

"Art. 113 (b)-1. *Adjusted basis:* *General rule.*—The adjusted basis for determining the gain or loss from the sale or other disposition of property, is the cost of such property* or, in the case of such property as is described in paragraphs (1) to (16) inclusive, of section 113 (a), the basis therein provided, adjusted to the extent provided in section 113 (b).

"The cost or other basis shall be properly adjusted for any expenditure, receipt, loss, or other item, properly chargeable to capital account, including the cost of improvements and betterments made to the property. * * *

"Art. 114-1. *Basis for allowance of depreciation and depletion.*—The basis upon which exhaustion, wear and tear, obsolescence, and depletion will be allowed in respect of any property is the same as is provided in section 113 (a), adjusted as provided in section 113 (b) for the purpose of determining the gain from the sale or other disposition of such property, * * *." (Italics ours.)

The precise point presented for our consideration does not appear to have arisen before. True, there have been many cases involving contributions by shippers to Railroad Companies for the purpose of defraying the cost of constructing spur lines or warehouses; by consumers and prospective customers towards the erection of electric power lines; and by boards of trade and other local public groups as an inducement to have factories locate in the community. But these cases all involved the question of whether or not the contribution constituted taxable income to the donee. A negative answer to that precise question was given by the Supreme Court of the United States in the leading decision of Edwards v. Cuba R. Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, and the courts have uniformly adopted this principle. Apparently however, depreciation was allowed, in the above situations, on the original investment without regard to the effect of the contribution. Thus, in Tampa Electric Co. v. Commissioner, 12 B.T.A. 1002 (which involved contributions for the extension of electric service lines) the Board stated, in its findings of facts: "The petitioner depreciated the extended lines the same as it did other similar property owned by it." See, also, Frank Holten & Co. v. Commissioner, 10 B.T.A. 1317; Appeal of Liberty Light & Power Co., 4 B.T.A. 155; Kauai Ry. Co., Ltd., et al. v. Commissioner, 13 B.T.A. 686.

A persuasive analogous situation may be found in the case of Nashville Warehouse & Elevator Corp. v. Commissioner, 6 Cir., 105 F.2d 883, which concerned the basis for determining gain or loss from the sale or exchange of property. The case arose under section 113 (a) of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 380, which provided that:

"The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property."

Here again, as in the statutory provision for depreciation, the Act refers only to "cost", and not to "cost to the taxpayer". The only material difference from the facts of the instant case was that the money in the Nashville decision had been collected from an insurance company after the property had been destroyed by fire. The Court stated, however, at page 885 of 105 F.2d:

"The purchase price was $40,000, but the Board allowed only $12,733.67 as net cost to the petitioner, upon the ground that the balance over and above the cash down payment was paid from insurance proceeds recovered when the property was destroyed by fire. Obviously the full item should be included in figuring the cost of the property. Whatever the source of the funds from

which payment was made, the cost was $40,-000."

In the light of this quotation it would appear, in the instant case, that the "cost", for the purpose of depreciation, of the asset, which is the plant, would remain the same regardless of the source of the funds from which payment was made. And even though part of the money was donated by an interested party, the total cost of the asset, not the net cost to the taxpayer, is the proper basis to be used in determining depreciation as well as gain or loss, if the asset belongs solely to the taxpayer. It is almost unnecessary to state that the "cost" figure adopted by a taxpayer must be reached in the absence of fraud. For example, the purchase of securities from a subsidiary at an excessive price does not permit the use of the price paid as the "cost" price. Pennsylvania Indemnity Co. v. Commissioner, 3 Cir., 77 F.2d 92. There is no suggestion of fraud, however, in the present situation. Accordingly, the basis for depreciation of the plant constructed and owned by petitioner in the instant case should be the amount of money actually expended in the building thereof, namely, $39,766.13, and not that sum less the $20,000 received by it from the Maryland Slag Company as a contribution towards the cost of erecting the plant.

In the light of the view we take of this case, it is not necessary at this time for us to determine with legal exactness the precise nature of the $20,000 contribution under section 113(a)(2) of the Revenue Act of 1936. On this operative subtle nuance between donative intent and donative motive when a gift is made for business purpose, compare American Dental Co. v. Commissioner of Int. Rev., 128 F.2d 254, decided May 15, 1942, by the Seventh Circuit, with Sportwear Hosiery Mills Co. v. Commissioner of Int. Rev., 129 F.2d 376, decided June 25, 1942, by the Third Circuit. Suffice it to say that the $20,000 was in the nature of a gratuity to petitioner as an inducement to build the plant at the selected location because petitioner would use slag, a product being marketed by the Maryland Slag Company, as a coarse aggregate in the manufacture of its concrete.

Counsel for petitioner and counsel for respondent have laid great stress on whether or not the contribution of the Maryland Slag Company was a technical gift. We do not think an answer to this question is in any way essential to a determination of the problem before us. Let us suppose that Chitwood has decided to erect a hotel costing him $75,000 at Midmont. The local Chamber of Commerce is very desirous that this hotel should cost $100,000. A precise contract is executed by both parties to the effect that the new hotel, Midmont Manor, will be erected at a total cost of $100,000, and that the Chamber of Commerce will contribute $25,000. This contract is duly performed by all parties.

Chitwood will then own completely Midmont Manor, a capital asset actually costing $100,000, and, if the money is well spent, a capital asset worth $100,000. Realistically, at least, Midmont Manor depreciates to Chitwood as a capital asset representing $100,000. And this depreciation, in nature and amount, is exactly the same, regardless of the source or sources from which the $100,000 was derived. And we think the same decision must be reached if, instead of the contribution of the Chamber of Commerce, Chitwood received as a pure and unconditional gift from a wealthy uncle the sum of $25,000 which, with the $75,000 already owned by Chitwood, was spent in the erection of Midmont Manor. In matters of taxation, realities should be controlling.

It is also quite obvious that the Maryland Slag Company did not consider itself as embarking on a joint adventure with the petitioner. The record is barren of any negotiations carried on prior to the investment regarding the usual attributes of a joint venture such as division of profits and losses, extent of participation in the conduct of the business, or the respective responsibilities of the investing parties. To the contrary, the plant was erected by the petitioner for use in its own business. No consideration ever flowed from petitioner to Maryland Slag for the contribution. *Nor was there any right, title, interest or control in or over the plant vested in Maryland Slag by virtue of the contribution.* Thus, if petitioner cannot take a depreciation of the $20,000, no one can. Such a result would seem to violate the plain provisions of the statute, the ordinary dictates of common fairness, and the accepted standards of sound business practice.

For the reasons assigned, the decision of the Board of Tax Appeals is reversed.

Reversed.