COMMISSIONER OF INTERNAL REVE-
NUE v. REVERE LAND CO.

GRANT BUILDING, Inc. v. COMMISSION-
ER OF INTERNAL REVENUE.

Nos. 9450, 9539.

Circuit Court of Appeals
Third Circuit.

Argued Feb. 5, 1948.

Decided June 18, 1948.

As Amended July 29, 1948.

Writ of Certiorari Denied Oct. 25, 1948.

See 69 S.Ct. 82.

Irving I. Axelrod, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., and George A. Stinson, Sp. Asst. to the Atty. Gen., on the brief), for Commissioner of Int. Rev.

Eugene B. Strassburger, of Pittsburgh, Pa. (J. Frank McKenna and E. B. Strassburger, Jr., both of Pittsburgh, Pa., on the brief), for Grant Bldg., Inc.

Thomas Watson, of Pittsburgh, Pa., for Revere Land Co.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

These two appeals present an intriguing financial triangle. Involved are three corporations, organized for the purpose of (1) acquiring a site; (2) financing; and (3) erecting and operating thereon an office building in the City of Pittsburgh, Pennsylvania.

First, there is the Revere Land Company (hereinafter referred to as "Revere"), the owner of the site. Second, there is the Strasswill Corporation (hereinafter referred to as "Strasswill"), which played the role of promoter and financing agent in the construction of the office building. Third, there is the Grant Building, Incorporated (hereinafter referred to as "Grant"), which is the builder and operator of the building and which holds title to it.

A close relationship exists among the three corporations. During the tax years under review, Revere, the owner of the land, owned 50% of the common stock of Strasswill and the latter, in turn, owned in excess of 90% of the common stock of Grant. A prominent figure in the transaction was one W. J. Strassburger, president of both Strasswill and Grant. It was Strassburger who originally promoted the acquisition of the site and the subsequent financing and construction of the office building.

Preliminarily it may be stated that pursuant to a 99-year lease agreement dated August 16, 1927,[1] providing for an annual rental of $138,000 (later reduced to $130,140), Grant erected, on Revere's land, the 35-story Grant Building with underground garage. The building was completed in 1929 at a cost of approximately $5,600,000.

Revere was the originating source of the $1,026,227.50 which is the controversial item involved in these two appeals. The Tax Court first held in the Revere case that Revere had a depreciable interest in the Grant Building in the sum of $1,026,227.50 (deductible at the rate of 2% per annum)[2] and some nine months later (citing its ruling in the Revere case) reduced Grant's depreciable interest in the Grant Building by the same amount. In both instances the Tax Court premised its rulings in favor of Revere and against Grant, on its fact finding that Revere had "contributed" the $1,026,227.50 towards the construction of the Grant Building as a "capital investment", and accordingly had a depreciable interest in the building in that amount.

The Commissioner appealed in the Revere case, No. 9450. Grant appealed in No. 9539.

The Commissioner takes the position in both the Revere and Grant cases "that the Tax Court did not correctly interpret the facts and Grant, not Revere, should have been allowed depreciation."[3] He contends that the record in the Revere case establishes that the $1,026,227.50 was part of Revere's "cost of the land leased to Grant upon which depreciation cannot be taken", and points to the fact that Revere so treated

---

[1] The lease provided for 9 renewals of 99 years at the lessee's option.

[2] It was stipulated in both the Revere and Grant cases that the Grant Building has a composite depreciable life of 50 years from the date of its completion in 1929.

[3] Commissioner's brief in the Revere case, page 10.

the transaction on its own books, classifying the outlay under the heading "Cost of Land".

Finally, the Commissioner urges that his view, that Grant and not Revere is entitled to the depreciation, is supported by the additional facts established by the Grant record and that this Court can take judicial notice of the additional evidence in the Grant record and reverse and remand in the Revere case "in order to prevent a grave miscarriage of justice."

The Commissioner asserts that the record is so clear in the Revere case that the decision of the Tax Court should be reversed. In the event of such reversal it "consents" to a reversal of the Tax Court's decision in the Grant case. The Commissioner urges that as a "minimum" both cases should be reversed and remanded for further proceedings.

In reply, Revere urges that the Tax Court's findings in its favor are based on substantial evidence, that there was no "clear-cut mistake of law" and that accordingly, under the Dobson doctrine, there must be an affirmance by this Court.[4]

The contentions of the parties impose the necessity of considering the records in the two cases in order to determine whether there was "substantial basis" for the Tax Court's findings. Since the Grant record contains evidence absent in the Reverse case, the cases will be treated separately.

### I. The Revere Case.

The findings of fact of the Tax Court[5] taken from the stipulation of facts, exhibits and oral testimony, may be summarized as follows:

Revere, Strasswill and Grant are Pennsylvania corporations, each having its principal office in Pittsburgh, Pennsylvania. Revere was incorporated on July 7, 1927. Strasswill and Grant were incorporated prior to July 30, 1927.[6] On July 30, 1927, while Revere was "negotiating and * * * about to consummate the purchase of * * * a certain tract of land * * *"[7] on Grant Street, Pittsburgh, it entered into a contract with Strasswill. The contract, in its preamble, stated that Strasswill had proposed to Revere "the promotion, financing and erection and construction of an office and garage building" upon Revere's land; that Strasswill had had plans and specifications prepared for the proposed building and had completed arrangements for the major portion of financing of the project, and further, had obtained sufficient responsible tenants to justify erection of the building.

The contract then stated the following provisions:

Conditioned upon Revere acquiring title to the site and further conditioned upon Strasswill *"producing evidence satisfactory to"* Revere of its *"ability * * * completely to finance the erection and construction to completion of said proposed building with the sum hereinafter to be contributed by"* Revere *"towards such construction"*, Revere gave to Strasswill a 90-day option to lease the site for a 99-year term, with options for renewals, at a net annual rental of $138,000, the latter to be reduced by an amount equal to 6% annually of the amount received by Revere from the City of Pittsburgh for the taking of a part of the site.[8] Conditioned upon Strasswill's negotiation of a valid contract with Thompson-Starrett Company for the erection of the proposed office and garage building at a cost of not less than three million dollars in accordance with plans and specifications to be approved by Revere, the latter, upon the execution of the 99-year lease previously mentioned, agreed to "pay or cause to be paid" to Strasswill, or its nominee, the sum of $1,030,877.95[9] of which $1,002,500 was *"to be*

4 Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 247, 88 L.Ed. 248; Commissioner v. Scottish American Investment Co., Ltd., 1944, 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113.

5 The findings of fact and opinion of the Tax Court are reported in 7 T.C. 1061.

6 The actual date of incorporation of Grant was December 22, 1925, and that of Strasswill was July 5, 1927, according to the stipulation in the Grant case.

7 As stated in the July 30, 1927, agreement between Revere Land Co. and Strasswill Corporation, Exhibit 4.

8 The rental was subsequently fixed at $130,140 annually.

9 The sum of $1,030,877.95 was later

*used, employed and applied exclusively and solely*" by Strasswill "*towards or on account of the cost of the construction and completion of the aforesaid proposed office and garage building in manner to be hereafter mutually agreed upon*", and the balance of $28,377.95 was to be used in payment of Strasswill's expenses in connection with the building project.

The Revere-Strasswill option agreement was assigned by Strasswill on the day of its execution to Grant.

On August 1, 1927, Grant served on Revere "Notice to Exercise Option". In the "Notice" Grant advised Revere of the fact that Strasswill had assigned to it the July 30, 1927, Revere-Strasswill option agreement. At the same time, it made demand upon Revere for payment of the $1,026,227.50 therein provided.

On August 5, Grant entered into a "Building Contract" with Thompson-Starrett Company for the construction of the Grant Building. This contract throughout refers to Grant as the "owner" of the proposed building. It provides, too, that Grant is to pay all of the cost of construction, architects' fees, etc. A photostat of a copy of the Contract was offered in evidence by Revere in its case.

According to the Stipulation, Revere's Board of Directors either authorized in advance or subsequently ratified the Contract.[10]

On August 16, 1927, Grant and Revere executed the 99-year term lease. On February 7, 1928, a Supplemental Agreement was executed fixing a reduced rental of $130,140 a year pursuant to the taking of a part of the site by the City of Pittsburgh.

The August 16, 1927, lease, in addition to fixing the term, option for renewals, rent and construction of the Grant Building at a cost of not less than $3,000,000, previously mentioned, contained the following provisions:

"Article III

"Demolition and Construction of Building.

"Sec. 3. The Lessee *at its own expense* * * * *will demolish* the present buildings on the leased premises *and in place thereof will construct* * * * *a new building* * * * *.*" (Emphasis supplied.)

"Sec. 5. In case of destruction of or damage to any building * * * the Lessee, * * * shall, within eighteen (18) months, completely restore, rebuild or replace such building * * *."

"Removal, Repairs and Alterations of Buildings.

"Sec. 10. * * * and during the term of this lease the Lessee shall at all times keep in good order and repair inside and out all buildings and structures hereafter constructed on or appurtenant to said premises, including any and all equipment which may be therein contained, and shall from time to time make renewals and replacements of such equipment so that at all times said buildings, structures and equipment shall be in good order, condition and repair."

"Article IV

"Surrender and Ejectment

Sec. 6. Lessee shall, * * * at the end of the term * * * deliver up quiet and peaceable possession of the said premises, including all improvements thereon * * *."

"Article V

"Mortgage and Leasehold

"Sec. 2. The Lessee may at any time and from time to time encumber its interest in and under this lease by creating a mortgage or mortgages thereon mortgaging or pledging this lease * * *."

"Obsolescence of Building

"Sec. 10. In the event that at any time or from time to time any building or buildings erected upon the said demised premises shall have, in the opinion of the Lessee,

---

reduced to $1,026,227.50 by reason of certain expenses directly incurred by Revere in acquiring title to the land.

[10] "(21) Petitioner's board of directors from time to time duly adopted resolutions, either authorizing in advance or subsequently ratifying and confirming as corporate action the several instruments enumerated in this stipulation as Petitioner's Exhibits Nos. 1 to 11, inclusive." (The Building Contract was Revere's Exhibit No. 7.)

become obsolete * * * the Lessee, shall have the right and privilege, at its own cost, risk and expense, partially or wholly to demolish or raze the building or buildings or any part thereof so erected on said premises and in place thereof and in substitution therefor to erect such new buildings or parts of buildings upon the said premises of such character, style and design as shall be best adapted to and for the locality in which the demised premises are situate, but only upon the following conditions:

"Sec. 10(2). That no demolition or razing of the building or buildings then upon the premises or any part thereof shall be begun until Lessee shall have given satisfactory assurance to the Lessor that a building or buildings, to cost not less than $2,000,000, will, without delay, be erected upon said premises in substitution for the building or buildings so to be demolished, and until the plans and specifications for such new building or buildings shall have been approved in writing by the Lessor, its agent or representative; and

"Sec. 10(4). In the event of the demolition or razing of the building or buildings or any part thereof, as hereinbefore in this Section provided, the salvage shall belong to the Lessee."

"Sole and Entire Contract

"Sec. 14. *This lease constitutes the sole and entire contract between the Lessor and Lessee relative to the above demised premises* and shall bind all persons claiming under them in whatsoever character or capacity as fully as if they were in every instance named herein. No waiver or alteration of any of the provisions of this lease shall be valid or of any effect except the same be in writing, signed by the party to be bound thereby." (Emphasis supplied.)

Upon the execution of the lease Grant proceeded to erect the Grant Building. Revere paid an aggregate of $1,273,772.50 for the three parcels of land leased to Grant. The cost was later reduced to $1,142,772.50 as the result of the payment made by the City of Pittsburgh in the condemnation proceedings previously mentioned.

The Stipulation and Exhibits further establish the following:

Revere acquired the Hostetter Estate property on July 27, 1927—before the agreement with Strasswill. It made settlement for the Paripovich property on August 9, 1927. It took title on August 16, 1927, to the "Labor Union" property, purchased from William J. Strassburger, president of Strasswill.

On August 31, 1927, Revere gave its check for $1,002,500 to the Peoples Savings & Trust Company, Trustee, and on October 11, 1927, it gave to Grant its check for $12,727.50 making a total of $1,026,227.50. The latter sum was used in the construction of the Grant Building.

Revere's cash book for the year 1927 listed the payments of $1,002,500 and $23,727.50 as "Cost of Land". Payments to the sellers of the three parcels which comprised the site were similarly listed as "Cost of Land". Revere also maintained a ledger. The ledger contained a page captioned *"Cost of Land (upon which Grant Building is erected)"*. On that page was listed the dates and sums paid to the sellers of the three parcels mentioned and the payment of $1,002,500 to the Peoples Savings & Trust Company, Trustee, and the $23,727.50 to Grant. At the foot of the column in which the entries were made was listed the sum total of the outlays. The total so stated was $2,169,000 (the $2,169,000 consists of the $1,026,227.50 previously mentioned and the $1,142,772.50 which was the net cost of the three parcels of land.)

The Revere case involves income taxes for the years 1939, 1940 and 1941.

Revere for the first time asserted a depreciable interest in the Grant Building on March 9, 1943, in a claim for refund filed with the Commissioner following the latter's action in asserting a total deficiency of $383.00 for the three tax years in question. On January 22, 1945, Revere filed a petition with the Tax Court for a redetermination of the $383.00 tax deficiency set forth by the Commissioner and claimed that it was entitled to a refund of some $18,600 based on its asserted depreciable interest in the Grant Building.

Revere's 1939, 1940 and 1941 Federal corporate income, excess-profits and capital-

474

stock tax returns, which were in evidence, disclosed that during those years it did not claim deductions for a depreciable interest in the Grant Building.

In the schedules which were part of the corporate income tax returns captioned "Balance Sheet", wherein assets and liabilities were to be stated, Revere did not list any investment in the Grant Building. On the other hand, it listed an investment of $2,169,000 under Item C, "Capital Assets (c) Land". The $2,169,000 is the sum total of Revere's cost of the site and the disputed $1,026,227.50.

The tax returns also disclose the significant fact that Revere was the owner of 50% of the stock of Strasswill. July 30, 1938, was stated as the date of acquisition of the Strasswill stock.

The Revere record also included a petition of Grant to "Intervene or to Consolidate" under date of July 24, 1946, which was denied July 29, 1946.

Following the Tax Court's order in favor of Revere on October 29, 1946, Grant, on November 13, 1946, filed a motion "Renewing Motion to Intervene and to Consolidate Cases and to Vacate Opinion". This motion was forthwith denied.

The first petition to Intervene or to Consolidate alleged the following: Grant had, from 1930 to date, taken as a deduction both on its books and on its tax returns, the depreciation on the entire cost of the Grant Building without objection from the Commissioner or Revere; Revere was "well aware of the fact that said depreciation was taken by Grant Building, Inc."; Revere kept its books and made its tax returns on the basis of ownership of land only and the disputed amount was carried on Revere's books as part of "Cost of Land"; Revere did not have any depreciable interest in the building nor was it ever intended that Revere should have any ownership in the building; Revere, in order to be assured that the office building would be erected upon its land offered to contribute the $1,026,227.50 for which it was to receive during the term of the lease, and has in fact received, a full 6% net; Grant issued to Strasswill 20,524 shares of its $50 par value preferred stock of a total par value of $1,-

026,200, plus 44,500 shares of its total 45,-000 shares common stock in consideration of (1) the right to have the 99-year lease assigned to it, (2) the right to receive the $1,026,227.50 from Revere, and (3) all the benefits accruing to Strasswill under its July 30, 1927, agreement.

Grant's second Motion to Intervene added the following allegations: Grant had been disallowed depreciation by the Commissioner on the disputed item because of the Tax Court's decision in the Revere case; the Tax Court had erred in finding in its opinion that "the payment in question by petitioner (Revere) towards the cost of the building had no connection whatever with the acquisition of the land" since the purchase of the land, the lease, the advancement of monies by all of the parties involved were simultaneous and part of one transaction; Grant had issued the preferred stock previously mentioned to Strasswill "with the knowledge and consent of Revere".

Finally, the record in the Revere case contains the testimony of John H. Hillman, Jr., president of Revere; John D. C. Miller, its assistant treasurer; and M. S. Sieger, certified public accountant and a partner in the firm of D. G. Sisterson and Co., Revere's accountants.

Hillman, who was also president of Revere during 1927 when the $1,026,227.50 was disbursed by his company, testified as to the "consideration which moved" to Revere for the payment. Under direct examination he stated that Revere did not receive from Grant, Strasswill or anyone else any promissory notes, bonds, stocks or securities in exchange for, or as consideration of, the disbursement by Revere. Following is an excerpt of Hillman's testimony on this subject (page 21a, Appendix to Brief for the Petitioner in the Revere appeal):

"Q. Would you say the only thing you had was what was in the lease? A. The only thing we had was what was in that lease.

"Q. That is the rental that was to come back to you from that lease? A. Yes.

"Q. Will you tell us how, if in any way, Revere Land expected to recoup the amounts they disbursed in these two checks?

A. Through depreciation on the money that went into the building.

Q. "Into the construction—A. Construction of the building.

"Q. As distinguished from the money that went into the purchase of the land? A. As distinguished from the money that went into the purchase of the land, yes."

Hillman further testified that he "never saw the books" of Revere until a week prior to the Tax Court's hearing but that he had seen a statement prepared in 1927 by his accountants which "stated very plainly how much went into the land and how much went into the building". He described the disbursements for land and building as separate and distinct transactions.

Questioned as to how the amount of the rental fixed in the lease was ascertained he said .(page 23a) :

"A. It was ascertained by the very simple method of multiplying the cost of the land plus the amount of money, adding to that the amount of money that went into the building and multiplying that by the old fashioned number of six percent."

Miller, assistant treasurer of Revere in 1927, and since that time, testified that he was in charge of the corporation's books and records and that he had made the entries listing the $1,026,227.50 disbursements as "Cost of Land" in the company's cash book and ledger account. He said that the latter disbursements were, however, incorrectly described in the accounts—that they were actually "Building Expenses". He said he could only account for making the entries as "Cost of Land" because "We didn't have a building account".

Sieger, the accountant, testified he audited the Revere accounts for the year 1927; that in his 1927 report there was " * * * a general heading 'Real Estate' and under that it shows the pure cost of real estate; Payment in connection with agreement with

Strasswill Corporation, to be used in construction of building, $1,002,500; and payment in connection with agreement with Strasswill Company, to be used for expenses, $28,377.95".

## Discussion.

The issue here is whether Revere as lessor of the leased land is entitled to depreciation under Section 23(1) of the Internal Revenue Code [11] on its $1,026,227.50 which ultimately was expended in the construction of the Grant Building.

█ It is well-settled that a prerequisite for a depreciation deduction from taxable net income under Section 23(1) of the Internal Revenue Code is an investment in the property sought to be depreciated. Detroit Edison Co. v. Commissioner of Internal Revenue, 6 Cir., 1942, 131 F.2d 619, affirmed 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286.

The Tax Court found as a fact that Revere had *"contributed $1,026,227.50 of the cost incurred in the erection of the building by the lessee (Grant). This payment was not an advance to be repaid by the lessee, but constituted a capital investment by the lessor in the building."* (Emphasis supplied.)

In accordance with its finding the Tax Court ruled that Revere had a depreciable interest in the Grant Building.

Revere contends here that the Tax Court's fact finding was based on "substantial evidence" and that its ruling must therefore be affirmed under the Dobson doctrine.

As already stated, the Commissioner vigorously urges that there is no "substantial basis" for the Tax Court's finding that Revere had a "capital investment" in the Grant Building and that on the contrary the record is so clear on that score that the Tax Court's order allowing the deduction for a depreciable interest should be reversed.[12]

---

[11] The relevant portion of Section 23 of the Internal Revenue Code, as amended by the Revenue Act of 1942, c. 619, Section 121(c), 56 Stat. 798 (26 U.S.C. A. Int.Rev.Code, Sec. 23), reads as follows:

"§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

"(1). Depreciation. "A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income. * * * *"

[12] The Commissioner advanced two

Our function under the circumstances is to ascertain whether the record discloses a "substantial basis" for the Tax Court's fact finding. In view of the nature of the issue we have been compelled to set forth the record in the case in considerable detail.

It is difficult to ascertain from the Tax Court's opinion the basis of its "capital investment" fact finding. The Tax Court seems to have adopted the simple premise that since Revere's money had been used in the construction of the Grant Building without any provision for repayment, the transaction can consequently be regarded only as a "capital investment".

At the outset of its opinion the Tax Court stated that the petitioner *contributed* $1,026,227.50 of the cost incurred in the erection of the building by the Lessee. The Tax Court apparently based its conclusion on the undertaking by Revere to "contribute" the money towards the construction of the building under the terms of the Revere-Strasswill agreement of July 30, 1927, plus the oral testimony of Revere's witnesses that the money was advanced as a building expense and that Revere "expected to recoup * * * through depreciation on the money that went into the building."

First as to the "contribution" of the money which went into the construction of the Grant Building.

■ A mere "contribution" is not sufficient by and of itself to give Revere a depreciable interest in the Grant Building under the statute.

■ In order for Revere to enjoy a depreciable interest in the Grant Building it was required to establish the fact that its contribution was made on such terms and conditions as to give it an investment status in the project. There is no evidence in the record to indicate that such was the intent of the parties. Revere by virtue of its "contribution" was not to share in the profits or losses of the operation of the Grant Building. It was not given any right, title, interest or control in or over the building by virtue of its contribution. The record is devoid of any evidence demonstrating that Revere considered itself as embarking upon a joint venture with Grant. On the contrary, Revere, as a result of its ownership of the land and its contribution of money towards the construction of the building, was, under the arrangements between the parties, to receive an annual fixed return (by way of rental) of 6% on the cost of the land plus the "contribution". . ·

■ The Tax Court, by its decision in this case, has enunciated the principle that one who merely makes a "contribution" to the cost of a building, by that simple fact, and independent of any other circumstances, undertakings or conditions, becomes an "owner" to the extent of the sum contributed. That is a proposition contrary to the concept of depreciable interest as defined by the statute and judicial decisions. While such an unqualified contribution would result in a corresponding reduction of the recipient's depreciable interest, that does not mean that the contributor, merely because of his contribution, attains or is invested with a depreciable interest.[13]

The Courts have recognized that it might well be that under certain circumstances neither the contributor nor the recipient is entitled to depreciable interest in the amount of the contribution. Arundel-Brooks Concrete Corporation v. Commissioner of Internal Revenue, 4 Cir., 1942, 129 F.2d 762 (reversed on other grounds).[14]

contentions in the Tax Court with respect to his refusal to allow Revere any deduction for depreciation. The first was that the $1,026,227.50 "was, in reality, an additional cost to petitioner (Revere) of the land leased." The second was that Revere did not sustain a loss upon the termination of the lease if depreciation was denied. The Tax Court specifically and flatly rejected both contentions, ruling as to the first, as already noted, that Revere had made a "capital investment" and as to the second that Revere's "investment" would not be re-

turned to it unless deduction for depreciation were allowed. (Emphasis supplied.)

[13] Detroit Edison Co. v. Commissioner of Internal Revenue, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286.

[14] In the latter case the Arundel-Brooks Concrete Corp. erected a concrete mixing plant on the property of the Bethlehem Steel Corp. which in turn was adjacent to the property of the Maryland Slag Co. Bethlehem Steel furnished the site of the mixing plant and Maryland Slag contributed 50% of

Nowhere in the documentary evidence is there any indication that there was any intention by Grant to give Revere an investment status in the Grant Building. The July 30, 1927, Revere-Strasswill agreement provided for the contribution by Revere "to be used, employed and applied exclusively and solely * * * towards or on account of the construction * * *" etc., of the Grant Building. The August 1, 1927, "Notice to Exercise Option" served by Grant on Revere merely advised the latter that Strasswill had assigned to it the July 30, 1927, agreement and made demand upon Revere for the sum provided therein. The August 16, 1927, Grant-Revere 99-year lease and the Supplemental Agreement of February 7, 1928, reducing the rental, made no mention of the disbursements by Revere.

It may be interposed at this point that in his opening statement to the Tax Court, counsel for Revere, Thomas Watson, Esq., who was also its secretary, stated that the issue as to who was entitled to the depreciation in dispute " * * * will probably turn upon the terms of the lease * * *". That the original July 30, 1927, option agreement between Revere and Strasswill (subsequently assigned to Grant) was merely "preliminary" in nature, was conceded by Watson. In referring to the lease between Grant and Revere he stated, " * * * that lease was preceded by a preliminary financial arrangement between a corporation known as the Strasswill Company and the Revere Land Company, this petitioner".

In this connection it will be recalled that Section 14 of Article V of the Lease provided that *"This Lease constitutes the sole and entire contract between the Lessor and Lessee relative to the above demised premises. * * *"* (Emphasis supplied.)

There remains only the oral testimony on behalf of Revere.

This testimony contains nothing to even warrant an inference that either Strasswill or Grant had entered into any agreement, written or oral, with Revere, giving it an investment status in the Grant Building. While Hillman, the president of Revere, testified that "Revere Land *expected* to recoup the amounts they disbursed * * * through depreciation on the money that went into the building", they did not say that there had been any agreement between Revere and Strasswill or Revere and Grant that Revere was to enjoy such a right of recoupment through depreciation. It was Hillman who executed the various agreements covering the transaction in behalf of Revere.

Hillman's testimony that Revere expected to "recoup" the disbursements in dispute via the depreciation route cannot bear analysis. The Grant Building according to the stipulation had a depreciable life of 50 years. A million dollars divided by 50 years makes $20,000 annually. That it was impossible for Revere, by any stretch of the imagination, to have "recouped" the sum of $1,026,227.50 over the 50-year period is convincingly demonstrated by the fact that for the three tax years under review the total depreciation recoupment allowed by the Tax Court was $13,809.50 or an average of $4,603 a year, and that is a far cry from $20,000.

Revere's failure to assert its depreciable interest until 1943, more than 13 years after the completion of the Grant Building, is the most convincing possible answer to Hillman's "recoup" testimony.

It is thus clear from the foregoing, that there was completely absent in the record any evidence of any agreement between the

---

the cost of construction. The reason for the contribution was the desire of Maryland Slag to enjoy the advantage of a nearby mixing plant in connection with the operation of its business. The Court held in that case that Maryland Slag was not entitled to any depreciable interest in the concrete mixing plant since it had made an outright contribution without any specific provision for an ownership interest to the extent of such con-

tribution. The Court further held that the Arundel-Brooks Corp. was entitled to depreciation on the entire cost of the plant, including the Slag Company's contribution. The latter ruling was subsequently reversed by the same Court in Arundel-Brooks Concrete Corporation v. Commissioner of Internal Revenue, 1945, 152 F.2d 225 following the decision in Detroit Edison Co. v. Commissioner of Internal Revenue, supra.

478

parties sustaining the Tax Court's finding that Revere had made a "capital investment" in Grant.

On the other hand, the record overwhelmingly demonstrates that the disbursements by Revere were not intended to be a "capital investment" and were in fact never asserted to be such until more than 13 years later, as previously mentioned, when Revere first claimed its depreciable interest following the Commissioner's determination of deficiencies in its tax returns for the years 1939, 1940 and 1941.

Revere's own books—its cash and ledger accounts—recorded the two items comprising the $1,026,227.50 disbursements as "Cost of Land" and not as an investment in the Grant Building.

Moreover, Revere's own tax returns for the calendar years under review, (1) failed to assert any claim for deduction by reason of a depreciable interest in the Grant Building and (2) listed its total disbursements in the Grant Building project—cost of the site and the $1,026,227.50 in dispute—as an investment in *land* under the item "Capital Assets (c) Land" of the schedules which were part of the tax returns, captioned "Balance Sheet", wherein capital assets and liabilities were required to be separately stated by the taxpayer.[15]

The oral testimony of Revere's witnesses designed to "explain" the description on its books and tax returns of the disbursements in dispute as "Cost of Land" is utterly incredible.

As to Hillman's testimony:

The tax returns disclose that all of the capital stock of Revere is owned by J. H. Hillman and Sons Company. While the record is silent on that point it is a reasonable inference that Hillman, whose full name is John H. Hillman, Jr., is one of the sons mentioned in the Hillman firm name. Hillman served as president of Revere from its organization and, as previously stated, signed all the agreements in connection with the project under review. He testified that Revere did not receive from

Grant, Strasswill or anyone else, any promissory notes, bonds, stocks or securities in exchange for, or in consideration of, the $1,026,227.50 disbursements. He said the "only thing we had was what was in the lease"—"that is the rental that was to come back * * * from that lease". His statement that Revere expected to "recoup" the critical disbursements through depreciation has already been discussed. Significantly Hillman testified that (as provided in the July 30, 1927, Revere-Strasswill agreement) the amount of rental was fixed on the basis of a 6 per cent annual return on Revere's total outlays in the Grant Building venture.

As to Miller's testimony:

Miller, it will be recalled, was and is Revere's assistant treasurer. He was one of the two officers of Revere charged with the preparation of the tax returns under review and he signed all three returns. It was Miller who had charge of the Revere books and who entered in 1927 on its cash and ledger accounts the disbursements to Grant as "Cost of Land". His "explanation" as to the latter—19 years after the event—that "we didn't have a building account" simply beggars description.

Miller did not attempt any explanation as to why, in making Revere's tax returns, he did not claim deduction for depreciation in the amount of Revere's alleged "investment" in the Grant Building; nor did he account for his action in listing the disbursements in question as "an investment in land" in the Balance Sheet schedules in the tax returns. His silence on this score speaks for itself.

As to Sieger's testimony:

Sieger was the accountant for Revere. He testified that in his 1927 audit report of Revere the "pure cost of real estate" was separately noted and that the two disbursements comprising the $1,026,227.50 were separately noted as payments "to be used in construction of the building" and "to be used for expenses". Even were that so it would not constitute any evidence that Re-

[15] The sum of $2,169,000 was stated under the heading "Capital Assets (c) Land". The $2,169,000 was obviously the sum total of the $1,142,772.50 consideration paid to the sellers of the three parcels which comprised the site of the Grant Building and the $1,026,227.50 disbursements in dispute.

vere had an investment interest in the building because a mere "contribution" by itself would not achieve such a status, as already pointed out.

That Sieger himself did not interpret the mere contribution to be an "investment" is apparent from his own past conduct in the matter. As previously mentioned, Sieger was a partner in the accounting firm of D. G. Sisterson and Co., Revere's accountants since its organization. The 1939 and 1940 tax returns disclose that D. G. Sisterson prepared them. The 1941 tax return reveals that Sieger himself prepared it. These tax returns, as was noted in the discussion of Miller's testimony, did not claim any deduction for depreciation by reason of any ownership interest in the Grant Building and in the statements of assets and liabilities did not set forth any ownership interest in the Grant Building, but on the contrary, listed Revere's total outlays in the project as an investment in "land".

It is too obvious to require any extended discussion that had the accountants regarded the 1927 audit as indicating a "capital investment" in the building, they would have so treated it in the tax returns and would have claimed the deduction for depreciable interest which would have been allowable under such circumstances.

■ It was in the face of this overwhelming testimony that Revere had consistently *not* treated the $1,026,227.50 as a capital investment in the Grant Building, either on its own accounts or in its tax returns, when by doing so in the latter instance it could have substantially reduced its taxes, that the Tax Court made the ruling under review. Its action reminds us of the witness who propounded to the Court the question: "Do you believe what you see or what I tell you?" The conclusion is inescapable that the Tax Court ignored the overwhelming weight of the evidence and came to a conclusion which was not only without "substantial basis" but was without any basis at all.

The Tax Court's finding becomes more difficult to digest in view of the fact that before it were the allegations made in Grant's first motion to intervene which cast considerable light on the entire transaction. Without repeating all the allegations which are set forth in the discussion of the record, it will be recalled that they asserted that Revere had, since the completion of the building, at all times been aware of the fact that full depreciation was taken by Grant and that Grant had issued to Strasswill $1,026,200.00 of its preferred stock plus 44,500 shares of its total 45,000 shares common stock (90%) in consideration, inter alia, of the right to receive the $1,026,227.50 from Revere.

■ While the Tax Court denied the motion to intervene and the Revere record does not as a consequence contain proof of these allegations, the Tax Court, nevertheless, was put on notice and should have accordingly given to the record in evidence the consideration imperatively requisite under the circumstances. That is especially so in view of the fact Revere's tax returns for the years under review disclose the significant fact that Revere owned 50% of the stock of Strasswill.

It must be emphasized in this connection that the second motion to intervene, after the Tax Court had made its order, added the further allegation that the preferred stock had been issued by Grant to Strasswill "with the knowledge and consent of Revere."

Anent these motions to intervene we are of the opinion that the Tax Court committed reversible error in denying them under the existing circumstances so as to require a remand. No other conclusion could be reached in view of the patent interrelationship of Revere, Strasswill and Grant.

However, we are of the opinion that independent of the situation with respect to the denial of the Grant motions to intervene, the decision of the Tax Court must be reversed.

■ Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, cannot serve as an impenetrable shield for Revere in this situation. Commissioner v. Scottish American Investment Co., Ltd., 1944, 323 U.S. 119, 124, 65 S.Ct. 169, 171, 89 L.Ed. 113, and the doctrine therein

stated gives us the applicable rule. "If a substantial basis is lacking the appellate court may then indulge in making its own inferences and conclusions or it may remand the case to the Tax Court for further appropriate proceedings."

The basis of our decision is the ineluctable conclusion that the Tax Court's finding that Revere had a "capital investment" in the Grant Building was "without substantial basis" and that the Tax Court erred as a matter of law in making such finding.

There isn't a modicum of evidence in the record of the enjoyment by Revere of any of the incidents of ownership in the Grant Building. Whether, in a given situation, the elements which constitute "investment" or "ownership" are *present* is a question of fact; what elements *must* be present to constitute "investment" or "ownership" is a question of law. In making its determination as to whether on the facts there was "investment" or "ownership", the Tax Court must apply the legal standard or measure contained in the terms.[16] The record overwhelmingly demonstrates that the Tax Court erred as a matter of law in its interpretation of the legal content of "investment" and "ownership" and that the finding that there was ownership interest such as to constitute a "capital investment" was "without substantial basis."

## II. The Grant Case.

The Grant record contains all of the agreements and exhibits introduced in the Revere case (with the exception of Revere's tax returns);[17] Grant's Federal Tax returns for the years 1943 and 1944 (involved in this litigation); petition of Revere and Grant addressed to the Board of Assessors of the City of Pittsburgh for reduction in assessment; Grant's common and preferred stock records; Agreement dated August 16, 1927, between Revere, Grant, the Hostetter Estate and Peoples Savings & Trust Company of Pittsburgh, Trustee; and the Stipulation.[18]

It is unnecessary to restate the details of those agreements and exhibits which were also in evidence in the Revere case or the stipulated facts which are common to both cases.

The significant new matter set forth in the Grant Stipulation may be summarized as follows:

Simultaneously with the assignment by Strasswill to Grant of the Revere-Strasswill agreement of July 30, 1927, Grant issued to Strasswill 20,524 shares of its preferred stock of a total par value of $1,026,200 and 44,500 shares of its 45,000 common stock issue (Paragraphs 15 and 21 of the Stipulation);[19] Grant annually furnished to Revere statements of assets and liabilities and profit and loss (Paragraph 39 of the Stipulation); Revere in

---

[16] As we held in Hatfried, Inc. v. Commissioner, 3 Cir., 1947, 162 F.2d 628; and Estate of Lueders v. Commissioner, 3 Cir., 1947, 164 F.2d 128; see also Orient Investment & Finance Co., Inc. v. Commissioner, App.D.C., 1948, 166 F.2d 601.

[17] The agreements and exhibits referred to include the July 30, 1927, Revere-Strasswill agreement; the August 1, 1927, "Notice to Exercise Option" served by Grant on Revere; the August 5, 1927, "Building Contract" between Grant and Thompson-Starrett Company for the construction of the Grant Building; the August 16, 1927, Revere-Grant lease; the February 7, 1928, Supplemental Agreement fixing rental; and the 1927 cash book and ledger account of Revere listing the $1,026,227.50 disbursements by Revere as "Cost of Land".

[18] The Grant record also contains the following exhibits: Extract from Strass-

will Corporation stockholders' organization meeting, July 29, 1927; Extract from Grant Building Incorporated stockholders' organization meeting, July 29, 1927; Extract from stockholders' meeting Strasswill Corporation, July 30, 1927; the journal entry of Grant Building, Incorporated, dated August 29, 1927; balance sheets of Strasswill Corporation dated July 31, 1927 and December 31, 1927.

[19] Grant's Journal Entry noted that $1,002,500 preferred stock was issued to Strasswill "in consideration for payment to us by Revere Land Co. of $1,002,-500.00 in cash, and the assignment by Strasswill Corporation to this Company (Grant Building, Inc.) of all contracts", etc., and its Cash Book Entry noted that $23,700 of preferred was issued to Strasswill in consideration of the $23,-727.50 which made up the $1,026,227.50 aforementioned.

its tax returns for the years 1930 to 1941 inclusive, claimed no deduction for depreciation with respect to the Grant Building; to finance, the construction of the Grant Building, Grant, in addition to the issue of its $1,026,200 preferred to Strasswill, sold $3,350,000 First Mortgage Leasehold 7% Sinking Fund Gold Bonds, $608,000 Second Mortgage Leasehold 6% Bonds, 500 shares common stock for $500 and $383,800 preferred stock (7676 shares at $50 per share).

As to Grant's Federal tax returns for the years under review, they disclose that Grant claimed the depreciable interest on the entire cost of the Grant Building. The tax returns also disclose that Strasswill owned almost 94% of Grant's outstanding common stock.

The Revere-Grant petition to the Board of Assessors of the City of Pittsburgh for reduction in assessment for the year 1936 described Revere as "the owner of the land" and Grant as "the owner of the building", with the specific statement "That Grant Building Incorporated pays to Revere Land Company an annual ground rent of $130,140 for said real estate" and "That Revere Land Company has no further interest in said real estate."

The 4-Party Agreement of August 16, 1927, between Revere, Grant, the Hostetter Estate and Peoples Savings & Trust Company of Pittsburgh, Trustee, specifically stated that Revere "is unwilling to invest in the securities of Grant Building Incorporated". This Agreement preceded by two weeks the initial $1,002,500 payment by Revere to Peoples Savings & Trust Company which was in turn paid over to Grant, and by almost two months the

$23,727.50 payment by Revere to Grant on October 11, 1927.

The Minutes of Strasswill and Grant relating to the assignment of the Revere-Strasswill Agreement of July 30, 1927, (referred to in note 18) establish that the preferred stock was to be issued by Grant to Strasswill "upon receipt of a like amount of cash".[20]

### Discussion.

As stated earlier in this opinion the Tax Court held that Grant was not entitled to depreciation on the Grant Building to the extent of the sum which it found was "contributed" by Revere. The basis for its ruling was that "the money was paid by the lessor (Revere) through the promoter (Strasswill) and petitioner (Grant) 'exclusively and solely' for its contribution toward the building cost. And what it contributed petitioner (Grant) did not".

In its opinion the Tax Court cited its decision in the Revere case. It also cited Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286, and Commissioner of Internal Revenue v. Arundel-Brooks Concrete Corporation, 4 Cir., 1942, 152 F.2d 225.

As in the Revere case, our function under the circumstances, is to ascertain in the instant case whether the record discloses a "substantial basis" for the Tax Court's fact finding.

In our opinion the Tax Court's finding was without "substantial basis" and accordingly must be reversed.

■ As we stated in connection with the Revere case, Revere's "contribution" did not in fact or in law attain the quality

---

[20] Exhibit 4-D, Extract from Grant stockholders' organization meeting, July 29, 1927, Grant appendix, page 34-a, after stating that Strasswill "has completely promoted the financing and erection and construction", continued: "The Chairman reported that Strasswill Corporation offers (a) to assign to this company all of the benefits and rights derived from the negotiations aforesaid, (b) to pay to this company the sum of $1,002,500.00 in consideration of (a) the issuance to the Strasswill Corporation of an amount of Preferred Stock at par equal to the amount paid in by the

Strasswill Corporation, (b) the issuance to the Strasswill Corporation of 44,500 shares * * *".

The Extract also contains the resolution accepting the offer of Strasswill to assign its rights under its agreement with Revere and states as follows: "Be It Further Resolved, that the directors and officers of the company be and they are hereby authorized (a) to deliver to the Strasswill Corporation $1,002,500.00 par value of the Preferred stock upon receipt of a like amount of cash; * * *" (Emphasis supplied.)

or status of an investment or ownership interest in the Grant Building under the statute. The record in the instant case conclusively establishes that Grant had an investment or ownership interest under the statute with respect to the entire cost of construction of the Grant Building including Revere's contribution. The money paid by Revere to Grant is not in the slightest degree different from other monies received for the building project. Grant "paid" for the money of which Revere was the originating source with the issuance of preferred stock to Strasswill in an equal amount, just as it paid for the other funds used in the construction of the building by the issuance of additional preferred stock and mortgage leasehold bonds. Grant further "paid" Revere for the money in question by contracting to pay a rental of 6% annually under the terms of the August 16, 1927, Lease.

No more convincing proof of the fact that Revere itself regarded Grant as the sole "owner" of the Grant Building is necessary than the undisputed fact that Revere did not claim any ownership interest in the property from the time of its completion in 1929 until 1943 and that during that period it was fully aware by reason of the submission to it of Grant's annual profit and loss statements, that Grant was claiming a depreciable interest by reason of its complete ownership.

The 1936 petition of Grant and Revere to the Board of Assessors of the City of Pittsburgh and the statements therein that Grant was the sole owner of the building and that Revere "has no further interest" other than the right to receive the annual ground rent of $130,140, is dispositive of any possible question on the subject of ownership. The fact that Revere on its own books treated the sum in controversy as a cost of land was fully discussed in the Revere case. In that connection it should be kept in mind that the Revere books were also in evidence in the Grant case. The Grant books and records also disclose that the sum in controversy was treated as received by Grant in consideration of the issue of an equivalent in preferred stock.

There was not a single iota of evidence in the Grant case to sustain a finding that it did not have a 100% investment or ownership status in the Grant Building. It is not necessary to repeat here what was said in the Revere case about the legal concept of "investment" or "ownership".

The Tax Court erred in its view that the Detroit Edison case, supra [131 F.2d 621], was dispositive of the question here. In the Detroit Edison case, new customers of the utility, were, in certain instances, required to pay for the installation of power lines and equipment. The sums contributed by the consumers were transferred to surplus through an account designated as "Contributions for Extensions". The Supreme Court held that the facilities paid for by the consumer contributions could not be added to the depreciable property of the utility on the ground that they were constructed without cost to the utility. In the Detroit Edison case the company did not "pay" for the sums contributed by the consumer by the issuance of stock or any other security. It was solely in the position of donee of the facilities constructed as a result of the consumer contributions. In the instant case Grant "paid" for the money which was contributed towards the construction of the building by issuing an equivalent value in preferred stock. The opinion of the Sixth Circuit in the Detroit Edison case, 1942, 131 F.2d 619, is illuminating on the question here involved:

"As thus used, the term (contribution to capital) signifies those resources whose dedication to the users of the corporation is made the foundation for the issuance of capital stock and which, as the result of the dedication, become irrevocably devoted to the satisfaction of all the obligations of the corporation." (131 F.2d at page 623.)

As to Commissioner of Internal Revenue v. Arundel-Brooks Concrete Corporation, supra, cited by the Tax Court:

In that case the Maryland Slag Co. contributed 50% of the cost of construction of a concrete mixing plant erected by the Arundel-Brooks Concrete Corp. The contribution was an outright gift. No stock was issued in consideration of the con-

tribution nor was there any intention on the part of the parties to accord any ownership interest in the building to the contributor. The Fourth Circuit had originally held that the Concrete Corp. was entitled to depreciation on the entire cost of the plant including the Slag Company's contribution, 1942, 129 F.2d 762. In accordance with the Detroit Edison decision, the Fourth Circuit in 1945, 152 F.2d 225, reversed its earlier ruling, holding that the depreciable interest of the Concrete Corp. was limited to the extent of its own investment.

Since Grant was the complete owner of the building by reason of the fact that it bore the entire cost of its construction, it was entitled to the statutory deduction. As was said in Helvering v. F. & R. Lazarus & Co., 1939, 308 U.S. 252, at page 254, 60 S.Ct. 209, at page 210, 84 L.Ed. 226 where too a 99-year lease was involved:

"Where it has been shown that a lessee using property in a trade or business must incure the loss resulting from depreciation of capital he has invested, the lessee has been held entitled to the statutory deduction."

The Grant lease was for a 99-year term. It was stipulated that the structure had a depreciable life of 50 years from the date of its completion in 1929, approximately half of the term of the lease. Under the latter there was no duty on the part of the lessor to make any contribution towards maintenance, modernization or rebuilding. Inevitably the burden was upon the lessee to maintain the building in such condition as to make it attractive to those who occupied it and it would accordingly be compelled to bear the cost of such maintenance or modernization in order to enable the property to operate profitably.

Thus the requirement in the Detroit Edison case that the taxpayer must have borne the cost of the construction of the property for which it claims deduction and the requirement in the Lazarus case that the loss resulting from depreciation of invested capital must fall upon the taxpayer, both exist in the instant case.

Accordingly, we are of the opinion that Grant was entitled to the full depreciable interest in the Grant Building and the decision of the Tax Court must be reversed.

For the reasons stated in the separate discussions of the Revere and Grant cases, the decision of the Tax Court as to each will be reversed.