CHAMPION TROPHY MFG. CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent LEO C. BASILE and CATHERINE BASILE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Champion Trophy Mfg. Corp. v. Commissioner
Docket Nos: 3823-71, 3824-71.
United States Tax Court
T.C. Memo 1972-250; 1972 Tax Ct. Memo LEXIS 6; 31 T.C.M. (CCH) 1236; T.C.M. (RIA) 72250; December 21, 1972, Filed Leo C. Basile, pro se. David P. Smith, *8 for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases the respondent determined the following Federal income tax deficiencies and additions to tax against the petitioners: Champion Trophy Mfg. Corp. Taxable
Additions to Tax [1] Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
1966
$ 196.40
$ 49.10
$ 9.82
1967
2,138.97
534.74
106.95
1968
1,991.09
99.55 Leo C. Basile and Catherine Basile Taxable
Additions to Tax Year
Deficiency
Sec. 6651(a)
1966
$ 510.52
$127.63
1967
1,691.63
253.74
1968
1,324.31
The issues presented for our decision are: (1) Whether the corporation is entitled to take a deduction for depreciation with respect to certain machinery used in its business; (2) whether the payment by the corporate petitioner of certain insurance premiums was an ordinary and necessary business expense or alternatively constituted income to the individual petitioners; (3) whether the corporation adequately established *9 the identity of certain components of its cost of goods sold entitling it to utilize this figure in arriving at its net income; (4) whether or to what extent the evidence presented substantiates the deduction, as an ordinary and necessary business expense, of certain travel and entertainment costs; (5) whether the individual petitioners received preferential dividends from the corporation in the form of certain personal expenses paid by the corporation; (6) whether the individual petitioners received capital gain income to the extent that any dividends received exceeded the corporation's earnings and profits as well as exceeded the basis of petitioner Leo C. Basile in the stock of the corporation; and (7) whether the corporate and individual petitioners are liable for the additions to tax under sections 6651(a) and 6653(a). Findings of fact/ A few of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Champion Trophy Mfg. Corp., the petitioner in Docket No. 3823-71, is a Delaware company incorporated on August 31, 1965, with its principal office located at 1117-19 Ninth Avenue, Altoona, Pennsylvania. *10 The corporation filed its Federal income tax returns for the years 1966, 1967 and 1968 with the district director of internal revenue at Pittsburgh, Pennsylvania. It is in the business of manufacturing and selling trophies. Leo C. and Catherine Basile are husband and wife who were legal residents of Duncansville, Pennsylvania, when they filed their petition in Docket No. 3824-71. They filed their joint Federal income tax returns for the years 1966, 1967 and 1968 with the district director of internal revenue at Pittsburgh, Pennsylvania. Champion Trophy Mfg. Corp., and Leo C. and Catherine Basile chronically filed their required Federal income tax returns late. The corporation's Federal income tax returns for 1966 and 1967 were filed on July 8, 1968. The corporation income tax return for 1968 was filed on March 17, 1969. The returns were due on March 15 of the year following the taxable year in question. The individual petitioners' Federal income tax returns, which were due April 15, 1967 and 1968, were filed on July 19, 1968, and July 15, 1968, respectively. Their 1968 income tax return was timely filed. In the years from 1961 through 1967 the individual petitioners were delinquent *11 in filing their Federal income tax returns in six of those seven years. As of April 26, 1972, they had not yet filed their Federal income tax returns for 1969 and 1970. Champion Trophy Mfg. Corp. (herein sometimes called the corporation) is the successor business to Altoona Trophy, a sole proprietorship owned by the petitioners which operated at 1105 16th Street, Altoona, Pennsylvania. The corporation's Federal income tax returns for 1966, 1967 and 1968 gave as an address the same location previously occupied by the sole proprietorship. The corporation was chartered in late 1965 and began business in 1966. No stock was ever issued by the corporation. The stock record book was kept with other corporate and personal records of Leo C. Basile in the office of the corporation. Each corporate income tax return showed that no corporation, individual, partnership, trust or association owned directly or indirectly 50 percent or more of the corporation's voting stock. The corporation showed an opening inventory of $5,500 as of January 1, 1966. The closing inventory given for the predecessor company (Altoona Trophy) was $2,300. The capital stock of the corporation was valued at $2,300 for *12 the purposes of the 1966 corporate income tax return. This figure was chosen only because it represented the net worth of the sole proprietorship immediately before the beginning of corporate activities. No action was ever taken by the board of directors of the corporation to value the capital stock although the corporation was authorized to issue stock of no par value. The trophies manufactured by the corporation are merchandized personally by Leo C. Basile. The business entails a great deal of personal contact between Leo and numerous and diverse purchasers. The primary market is composed of bowling teams, high school athletic teams, sports car racing and other such sports. Leo personally contacts the potential purchaser, takes the order, fabricates the trophy, delivers the finished product and collects the sales price. He is the motivating and dominating personality of the corporation. The titular head of the corporation was Peter L. Basile, the son of Leo and Catherine Basile. Peter signed the 1968 corporate income tax return as "President." The 1966 and 1967 corporate returns were signed by Catherine Basile as "Secretary." The corporate petition filed herein seeking a redetermination *13 of the deficiencies was signed by Leo as "President." The formal hierarchy of the corporation varied but the day-to-day control and decision making authority and responsibility was vested entirely in Leo. The corporation had fixed depreciable assets of $5,000 on January 1, 1966. At the end of the taxable year 1966 this account showed a balance of $5,636.95. Depreciable assets with a value of $636.95 were acquired and placed into service during 1966. During 1967 depreciable assets valued at $504.05 were acquired and placed into service by the corporation. No further additions to depreciable asset accounts were made during 1968. Thus the corporation began its existence in 1966 with $5,000 in depreciable assets. By the end of 1968 it had added depreciable assets worth $1,141. Peter was a full-time college student during 1966 and 1967. He graduated from St. Francis College in Loretto in 1967. Peter was also working full-time for Sears Roebuck during 1966. During 1965 Peter worked in a Sears store in the Washington, D.C. metroplitan area. In April 1966 he transferred to a Sears store in Altoona, Pennsylvania. It was during the last few weeks of January 1965 that Peter, while working *14 at a Sears store in Washington, was introduced to Ralph Johnson, who told Peter that he was selling a Hermes Engraving Machine "for a friend." Peter's introduction to Johnson was made by a coworker at Sears with whom Peter had discussed his father's occupation (trophy manufacturing). Johnson, who had the machine in the trunk of his car, showed it to Peter in the Sears parking lot. Peter discussed with his father the possibility of purchasing the machine. They thought the machine was worth $2,500. Johnson wanted to sell it for $1,700--"all cash--no checks. "Peter's father finally told Peter that if he had the money to buy it. To pay for the machine Peter used the proceeds of a loan for $500 he had taken out nearly eight months earlier. To this sum he added an undisclosed amount borrowed from his girl friend. He paid the $1,700 to Johnson and received a receipt therefor. The receipt, dated February 4, 1966, and signed by Ralph Johnson reads: "Received from Leo Basile $1,700.00 for Hermes Engraving Machine." The receipt originally referred to "Machines;" however, as introduced it reads "machine." The discrepancy in the name of the purchaser is explained by the fact that at that time *15 Peter was also known by the name of Leo P. Basile. For reasons unexplained Peter used this alias when applying for a Federal Bureau of Investigation clearance. After keeping the machine in his possession for several months, Peter gave it to his father. Neither his father nor the corporation ever reimbursed Peter for the purchase. Peter's testimony referred only to the purchase of a single machine. He did not mention another machine purportedly purchased for $1,700 from one Jackie Rubich in Washington, D.C. The receipt for this machine, written on a plain brown paper bag, was never produced at trial although it was shown to the revenue agent who conducted the audit of the corporation. For the years 1966, 1967 and 1968 the corporation claimed deductions for depreciation of $560, $614 and $614 respectively. Included in these amounts was $340 representing depreciation taken on the engraving machines. They were depreciated on a straight line basis with a useful life of 10 years with no salvage value. Although Peter was at times referred to as the president of the corporation, he never received any salary or dividend income from the corporation. Whatever work he performed for the *16 corporation was done gratuitously. It was originally thought that, following his graduation from college, Peter and his father would jointly operate the corporation. This never occurred. After his graduation in 1967, Peter and his father had a falling out and Peter started out on his own as a sales engineer for a large corporation. He has had no dealings with the corporation since he contributed the engraving machine to it. Peter's position as president of Champion Trophy Mfg. Corp., was totally without substance. He did nothing in that role beyond the signing of the 1968 corporate income tax return. At no time has the corporation ever owned any automobiles. Whatever automobiles were used were owned in the name of Peter Basile. He owned three cars in 1966; a 1965 TR4A, a 1966 Plymouth sedan and a Plymouth station wagon. Peter operated the TR4A, his mother drove the sedan, and his father the station wagon. After Peter's marriage in 1967, he owned a total of four cars. He operated two while his mother and father each operated one of the cars. The same pattern of ownership and use existed in 1968. During 1966 at least $473.04 was paid by the corporation to the lien holder of Mrs. *17 Basile's car. During the same period the corporation paid $895.07 for Leo's car. The corporation made further unexplained car payments of $320.38 in 1966. The total paid ($1,688.49) was shown on the accountant's 1966 work papers as a loan to stockholders. In 1967 this same amount was transferred to travel expenses incurred by Leo during 1967 for which he had no substantiation. Thus the automobile payments made during 1966, and recognized by the accountant preparing the corporate returns as nondeductible to the corporation, reappeared in 1967 as a purported travel expense. The corporation made further payments on the automobiles in 1967 in the amount of $1,902.66. These payments, made by check, are reflected in the corporation's disbursement book. The payments were made on Mrs. Basile's sedan as well as on a new 1967 Plymouth station wagon purchased by Leo in 1967. During the years in question the corporation made various payments for automobile insurance on the various cars operated by the family members. Throughout the period 1966-1968 the corporation made numerous other insurance payments. Most were disallowed by the respondent. Two life insurance policies, each with a face *18 amount of $25,000 were issued during 1966 by the Equitable Life Assurance Society covering the life of Leo C. Basile. The owner and beneficiary of both policies was Peter L. Basile. The corporation paid the $309 annual premium on each policy. For a brief time the corporation's few employees were covered under a group health and accident policy. This policy was cancelled shortly after issuance because of nonpayment of premiums. The following chart shows the amounts claimed by the corporation as deductions and the amounts disallowed by respondent: 1966
1967
1968
Deduction Claimed
$1,272.92
$2,255.53
$2,416.95
Equitable Life
$619.55
$1,037.00
$1,236.00
Mutual of Omaha
138.60
132.60
234.20
Auto Insur- ance
164.00
431.00
189.00
Interest Paid
60.45
42.72
Blue Cross
183.73
160.64
Petty Cash
225.00
215.39
Disallowed by Resp.
982.60
2,009.33
2,077.95
Allowed as Deduction
290.32
246.20
339.00
Champion Trophy Mfg. Corp., although incorporated and active since August 1965, filed no corporate income tax returns until July 8, 1968. Responding *19 to pressure exerted by the Internal Revenue Service, the corporation retained an accountant to prepare the 1966 and 1967 returns. Because of the substantial expense it would have entailed to reconstruct the corporate books the accountant was required to take various shortcuts to complete the returns. As explained at trial, the accountant proceeded under the assumption that, if the starting and ending balance sheet figures were known, the characterization of the intervening transactions was not crucial--so long as they balanced. In the three years at issue the corporate Federal income tax returns showed the following: 1966
1967
1968
Gross receipts
$28,354.58
$30,953.80
$36,389.74
Less: Cost of goods sold
14,190.72
12,762.87
13,503.37
Gross profit
$14,163.86
$18,190.93
$22,886.37
Upon audit the respondent disallowed a portion of the claimed cost of goods sold deduction. For 1966 and 1967 the amounts disallowed were $1,230.58 and $4,673.05, respectively. The 1966 amount ($1,230.58) was referred to as a "plug entry" by the accountant preparing the tax returns. He had no substantiation for the figure. The money could have been spent on anything *20 at all. Exactly the same procedure was followed in arriving at the 1967 "plug entry" of $4,673.05. Neither of these figures is supported by purchase vouchers. They were inserted only to assist the accountant in arriving at a justifiable gross profit figure. The 1967 "plug entry" was in part composed of $1,902.66 which the books of the corporation showed had been spent on equipment. This sum was in fact paid out by the corporation in car payments and not equipment purchases as represented. Since the corporation's business involved a great deal of personal contact between Leo and his potential and actual customers, it was necessary for him to travel frequently to the areas around Altoona, Pennsylvania. For business reasons Leo found it necessary to personally deliver all trophies purchased. While delivering trophies Leo also attempted to secure further orders. The necessity of timely delivery precluded the use of the postal service. Travel during the period 1966-1968 resulted in substantial deductions being claimed by the corporation. The amounts claimed were as follows: Year
Amount
1966
$3,328.31
1967
3,543.34
1968
4,546.46
The expense diaries provide a *21 somewhat contemporaneous account of Leo's travels. They are desk diaries with a page for each day's appointments. On them is recorded the cost of the travel. The diaries are not complete but do show a consistent pattern of travel to various locations. For the most part the travel was to West Virginia, Maryland and Pennsylvania with occasional trips to New York. Leo drove to all of these locations with the exception of one airplane flight to Pittsburgh. Virtually all the expenses were paid for in cash excepting a few hotel bills paid by check or gasoline expenses charged to Leo's personal account. There are only scattered receipts, primarily for lodging and gasoline. The diaries consistently refer to four itemized categories of expenses: lodging, meals, gasoline and help. The "help" expense is listed extensively in 1966, but is almost nonexistent in 1967 and 1968. There are also numerous unexplained expenses during this period represented only by dollar amounts shown on various pages of the diaries. An examination of the diary for each year in question reveals the following: 1966
1967
1968
Lodging
$ 100.07
$ 403.94
$ 454.52
Breakfast
6.30
36.40
99.56
Lunch
244.25
78.90
95.93
Dinner
953.35
292.21
591.44
Gasoline
243.13
638.01
80.35
Help
631.10
20.00
4.00
Undesignated
821.29
1,875.45
55.75
Total
$2,999.49
$3,344.91
$1,381.55
*22 The corporation claimed as a deduction each year an amount greater than that disclosed by the diaries. For 1966 the excess of the amount claimed over that shown in the diary was $328.82; for 1967 it was $198.43; and for 1968 the excess was $3,164.91. In 1966 the diary shows 12 entries for lodging of which 9 are supported by receipts. In 1967 there are 33 receipts and 39 total entries for lodging. In 1968 there are 50 receipts and 50 lodging entries. With two exceptions there are no receipts for any of the meals purchased during these three years. A similar situation exists for the expenses allegedly incurred in employing temporary help during such travel. This "help" was of a casual labor nature--Leo hiring a youngster to help him carry the trophies from his car either to the purchaser or to a display area. There are also no receipts for the undesignated items during 1966 and 1967. In 1966 about 27 percent of the total amount shown in the diary is unaccounted for. The 1967 diary shows 56 percent of the expenses unaccounted for. In 1968 only 4 percent is unaccounted for. The respondent allowed the following amounts as travel expenses: Year
Amount
1966
$854.84
1967
161.30
1968
55.47
*23 In his notice of deficiency to the corporation the respondent disallowed the following expenses claimed by the corporation: 1966
1967
1968
Depreciation 340.00 340.00 340.00
Insurance Premiums 982.60 2,009.33 2,007.95
Purchases 1,230.58 4,673.05
Travel Expenses 2,473.47 3,382.04 4,490.99 In his notice of deficiency to petitioners Leo and Catherine Basile the respondent determined that Leo received preferential dividends from the corporation as follows: Year
Amount
1966
$1,302.21
1967
8,825.61
1968
6,263.54
Respondent also determined that Leo received a capital gain from the corporation in 1966 in the amount of $2,772.93, and disallowed a dependency deduction claimed for his son, Peter, in each of the taxable years. [2]
ULTIMATE FINDINGS 1. The corporation failed to establish any basis for the engraving machines and, therefore, is not entitled to the deductions claimed for depreciation in the taxable years 1966, 1967 and 1968. 2. The corporation is not entitled to the deductions it claimed for insurance premiums and to *24 the adjustments made by respondent for purchases included in cost of goods sold in the taxable years 1966, 1967 and 1968. 3. The corporation is entitled to the following deductions for travel expenses: Year
Amount
1966
$854.84
1967
865.37
1968
432.72
4. The unallowed deductions of the corporation for insurance premiums, purchases and travel expenses represent dividends to petitioner Leo C. Basile to the extent of the earnings and profits of the corporation. 5. The unallowed deductions of the corporation for insurance premiums, purchases and travel expenses for the taxable year 1966 which are in excess of the earnings and profits of the corporation and petitioner Leo C. Basile's basis in the stock of the corporation are taxable to petitioner as a capital gain. 6. The corporation is liable for the additions to tax under section 6651(a) for the years 1966 and 1967 and under section 6653(a) for the years 1966, 1967 and 1968. 7. Petitioners Leo and Catherine Basile are liable for the additions to tax under section 6651(a) for the years 1966 and 1967. OPINION Champion Trophy Mfg. Corp., the successor to a sole proprietorship operated by Leo C. Basile, *25 is engaged in the manufacture, selling and distribution of athletic trophies. The primary market is composed of bowling teams, race tracks and high school sporting activities. Leo Basile is the chief operating officer of the corporation. In 1965 the remaining assets of the sole proprietorship were transferred to the corporation. No stock was ever issued--the stock book lying beneath various papers in Leo's place of business. No one but Leo has ever been active in the business. Although the titles vary, the rights and responsibilities inherent in this corporation clearly have been assumed by Leo and he is regarded as its owner. Occasional references to Peter as the "president" of the corporation does not convince us of his office. He has never received any dividend or stock from the corporation. Following his graduation from college in 1967, he started out on his own and has not been associated with the corporation. During the time he was "president" of the corporation he never took any active part in its operations. Apparently the corporation was created with little thought as to what function it was to serve. Leo's prevailing idea was that the corporation would protect him from *26 unknown liabilities. The income tax difficulties encountered by the sole proprietorship also motivated its incorporation. Leo hoped that somehow making himself a "mere employee" of the corporation would protect him from further income tax difficulties. From all the evidence presented it is our firm conviction that Leo was the sole force behind Champion Trophy Mfg. Corp., and that Peter was not an influential force at all. All corporate actions were taken with the full knowledge and control of Leo Basile. The respondent has launched a broad attack on the corporate returns, questioning several items. We will discuss each of the issues below. 1. Depreciation Deductions. The corporation claimed the following depreciation deductions: Year
Amount
1966
$560.00
1967
614.00
1968
614.00 A large part of each year's deduction is based upon the exhaustion of two Hermes Engraving Machines. The corporation claimed a total value of $3,400 with a useful life of ten years and no salvage value. Consequently, each year it deducted $340 as depreciation on these machines. Petitioners argue that the amount of money involved is small and that the respondent is arbitrary *27 in attacking the deductions. They say petulantly that the way to avoid this trouble would have been to "buy expensive machines, take large deductions and pay no tax." Respondent, on the other hand, argues that the corporation has been claiming depreciation on two machines, yet evidence introduced at the trial purports to establish the purchase of only one machine. As to even the one machine the respondent asserts that no deduction for depreciation is justified since the corporate petitioner has not established the cost basis of that machine. Respondent urges that the testimony showing the purchase by Peter in a Sears Roebuck parking lot of an engraving machine for $1,700 is incredible when one considers the source of the funds used to purchase the machine, i.e., a $500 loan made by Peter some eight months previously and a loan from a girl friend. On brief the respondent attacks, for the first time, the genuineness of the receipt itself. Although the circumstances surrounding the purchase of such machine are strange, we need not decide this issue on that ground, whether untimely raised or not. *28 The corporation has the burden of proving its right to take a deduction for depreciation. The mere assertion of purchase is not enough. The corporation must have an investment in the asset and must establish it. See Rule 32, Tax Court Rules of Practice; Detroit Edison Co. v. Commissioner, 319 U.S. 98 (1943); Commissioner v. Revere Land Co., 169 F. 2d 469, 475 (C.A. 3, 1948). The burden rests with the petitioner corporation to show that respondent's determination is wrong. The corporation has not done so here. Its books and records were incomplete, inadequate and are incapable of being used to make any allocation of depreciable basis. The corporation's "outlay is the measure of [its] recoupment through depreciation accruals." Detroit Edison Co. v. Commissioner, supra at 102. Nothing in this record shows any outlay by the corporation to procure these engraving machines. Considering the evidence offered, we find no method by which we can determine a basis for depreciation purposes. The evidence shows that Peter paid for the machine purchased from Ralph Johnson and was never reimbursed by either his father or the corporation. *29 And nothing indicates that Peter made a gift of the machine to either his father or the corporation. We have found that Peter was not a shareholder in the corporation. Thus the basis of any property contributed by Peter to the corporation would take a basis of zero under section 362(c)(1)(B) of the Code. The machine was a useful addition to the capital assets of the corporation for which the corporation paid nothing. While obtaining the machine at no cost undoubtedly benefited the corporation, a denial of a depreciation deduction will not deprive the corporation of anything for which it paid. When a corporation receives a property contribution to its capital which is not contributed by a shareholder, a zero basis is appropriate. This provision of the Internal Revenue Code is the legislative response to Brown Shoe Co. v. Commissioner, 339 U.S. 583 (1950), where contributed capital, money and real property, were given a depreciable basis to the corporation in spite of the fact that the corporation paid nothing for the assets. Accordingly, we conclude on this record that the basis for the depreciation deductions claimed on the engraving machines has not been established *30 by the corporate petitioner. Respondent's determination is therefore sustained. 2. Insurance Payments. During the three years in question the corporation paid numerous insurance premiums and claimed deductions therefor. In 1966 the claimed deduction was $1,272.92; in 1967 it was $2,255.53; and in 1968 it was $2,416.95. In his notice of deficiency the respondent disallowed most of the claimed deductions with the following explanation: [An] analysis of this account and an inspection of the available policies revealed that [amount disallowed] was for policies of a personal nature, thereby being non-deductible personal expenses under Section 262 of the Internal Revenue Code. The respondent determined that the following amounts were improperly deducted by the corporation: 1966
1967
1968
Equitable Life Assurance
$ 619.55
$1,037.00
$1,236.00
Accident and health
138.60
132.60
234.20
Automobile insurance
164.00
431.00
189.00
Interest paid
60.45
--
42.72
Blue Cross
--
183.73
160.64
Petty cash--insurance
--
225.00
215.39
Total disallowed
$ 982.60
$2,009.33
$2,077.95
Amounts allowed
290.32
246.20
339.00
Total deduction claimed
$1,272.92
$2,255.53
$2,416.95
*31 The two life insurance policies issued by Equitable in the amount of $25,000 each listed Leo Basile as the insured. The beneficiary and owner of the policies was his son, Peter. The corporation paid the $309 annual premium on each policy. The corporation, which would have suffered greatly without the services of Leo Basile, was not named as a beneficiary under either of the policies, although Leo was certainly the "key man" in the corporation. Section 264(a)(1) provides that: No deduction shall be allowed for-- (1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy. This section denies a deduction to a taxpayer for insurance premiums paid if the taxpayer is directly or indirectly a beneficiary under the policy. The corporation does not stand to benefit if the proceeds of these policies, *32 which have no cash or surrender value, are paid. The person who will be benefited is Peter, the sole owner and beneficiary. The mere lack of a potential benefit to the corporation does not automatically entitle it to a deduction for premiums paid. See Arthur R. Womrath, 22 B.T.A. 335 (1931). Although arising under the Revenue Act of 1924, the provision [section 215(a)] involved in Womrathis substantially the same as present in section 264(a)(1). In Womrathwe stated the general rule that deductions from gross income are to be authorized only under the aegis of specific statutory language. However, in that case we could find nothing in the record which revealed the corporation's motive in paying the premiums. A failure of proof by the taxpayer there resulted in a disallowance of the deduction to the corporation. The respondent has asserted in the instant case that "the controlling question [under section 264] is whether the taxpayer is directly or indirectly a beneficiary" under the policies. See Rev. Rul. 70-148, 1970-1 C.B. 60. Where there is evidence *33 that the taxpayer is a beneficiary, section 264 clearly prohibits a deduction. Section 162(a) allows a corporation to deduct all ordinary and necessary expenses incurred in carrying on its trade or business. When insurance premium payments are shown to be ordinary and necessary expenses they are deductible. See Brown Agency, Inc., 21 B.T.A. 1111 (1931); Peerless Pacific Co., 10 B.T.A. 103 (1928) and Berizzi Brothers Co., 16 B.T.A. 1307 (1929). In each of these three cases the deduction for the payment of insurance premiums was allowed based on a finding that the payor was in no way benefited. Further, in each case the amount was treated as additional compensation paid to the employee. All three cases involved closely held corporations exhibiting varying degrees of care in the formalities of corporate procedures. In Berizzi Brothers Co., supra, no formal authorization by the corporation's board of directors was sought to authorize the payment of the insurance premiums. In Brown Agency, Inc., supra, explicit *34 authorization from the corporation's board of directors was sought and obtained to authorize the payment of the insurance premiums. In Peerless Pacific Co., supra, the board of directors authorized payment of the premiums when it was pointed out to them that the corporate minutes failed to reflect the authorization previously given. No formal corporate authorization was shown in the present case, even though it probably could have been obtained if the need for it had been realized. Petitioner Leo Basile testified that his salary was so low that he was unable to afford personal insurance protection. As a means of protecting its key employees the corporation paid certain insurance premiums. Insurance on petitioner's life was of undoubted economic benefit to him. It relieved him of the expense of providing life insurance for himself. The economic benefit is susceptible of valuation and as such should be included in his gross income. Commissioner v. Smith, 324 U.S. 177 (1945); Commissioner v. LoBue, 251 U.S. 243 (1956); Yuengling v. Commissioner, 69 F.2d 971 (C.A. 3, 1934), affirming 27 B.T.A. 782 (1933); *35 Paul L. Frost, 52 T.C. 89, 96 (1969). The evidence adduced at the trial with respect to the life insurance premiums is meager at best. And no evidence was submitted by Leo or the corporation to overcome the presumption of correctness attaching to the respondent's determination with respect to other types of insurance premiums paid by the corporation. Although we know in what amount these various premiums were paid, we have no proof as to corporate purpose or intent. The evidence shows that the corporation owned no automobiles, yet premiums covering automobile insurance were paid. The corporate books and records relating to the insurance premium payments were subpoenaed by respondent but never produced by petitioners. Failure of proof compels us to find for the respondent with respect to the disallowance of the claimed insurance deductions. Hoffman v. Commissioner, 298 F.2d 784 (C.A. 3, 1962) Rule 32, Tax Court Rules of Practice.
3. Purchases (Cost of Goods Sold). For the taxable year 1966 the respondent disallowed $1,230.58 as a component of the cost of goods sold for that year. Similarly, in 1967, the amount of $4,673.05 was disallowed. *36 The two items were claimed as part of the corporation's purchases. The corporation filed its 1966 Federal income tax return nearly 15 months late and its 1967 Federal income tax return approximately four months late. The information contained therein with respect to cost of goods sold was an approximation by the accountant who prepared the returns. The approximation on each return was premised on two erroneous bases: (1) That as long as opening and closing inventory was correct it mattered not to which account expenses were allocated; and (2) that the corporation could, if required, substantiate the claimed deductions. When required to substantiate the claimed cost of goods sold figures the corporation was unable to do so. To the extent the corporation was unable to prove the deduction, the respondent properly disallowed the expense. See Lustman v. Commissioner, 322 F. 2d 253 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; Sidney Cohen, 27 T.C. 221, 228 (1956). The "plug entries" made by the accountant in order to arrive at the gross profit figure were unsupported by the records then available to the accountant or now available *37 to us. The corporate petitioner has failed to rebut the presumption of correctness attaching to respondent's determination. We note, in passing, that no argument is presented in petitioners' brief on this issue. Consequently, we decide this issue in favor of the respondent. 4. Travel Expenses. During the three years in question the corporation deducted substantial amounts as travel expenses incurred by Leo Basile. The respondent disallowed most of these deductions, as shown in the following table: 1966
1967
1968
Deduction claimed
3,328.31
$3,543.34
$4,546.46
Amount allowed
854.84
161.30
55.47
Leo Basile was, by nature of his job, required to maintain personal contact with corporate customers in Pennsylvania and adjoining States. The travel expenses incurred by him were valid business expenses of an ordinary and necessary nature. We have not found them to be of a personal nature. They benefited the corporation. But substantiation is necessary for the allowance of the claimed expenses. Respondent argues, first, that the corporation must prove that the travel expenses were reasonable and necessary, and were incurred by Leo while away from home *38 in the pursuit of business. As already indicated, we disagree with respondent's conclusion. Secondly, respondent contends that the corporation has failed to meet the substantiation requirements of section 274 and the applicable Treasury regulations. Respondent has issued detailed and exacting regulations under this section, and their validity has been upheld. William F. Sanford, 50 T.C. 823 (1968), affirmed per curiam 412 F. 2d 201 (C.A. 2, 1969), certiorari denied 396 U.S. 841 (1969). See also John L. Ashby, 50 T.C. 409 (1968); and Robert H. Alter, 50 T.C. 833 (1968). Under section 274 we are not permitted to engage in approximations required under the Cohan rule ( Cohan v. Commissioner, 39 F.2d 540 (C.A. 2, 1930)). See Arthur C. Puckett, Jr. 56 T.C. 1092, 1096 (1971). Lacking substantiation the expenditures described by section 274 must be disallowed. We think respondent *39 failed to take into consideration the entire substantiation offered by the petitioners. We were able to arrive at a determination of the correct amount of substantiated expenses after a careful, indeed painstaking, analysis of the evidence offered. This evidence adequately proved certain expenditures--primarily those for lodging and gasoline. Our ultimate findings of fact reflect the amounts for each year which were properly substantiated. For 1966 the petitioners failed to prove the expenditure of any larger sum than that previously allowed by the respondent. For 1967 the diary and receipts, coupled with Leo's testimony, constitute adequate proof to substantiate a total travel expense deduction of $865.37. For 1968 the petitioners were able to substantiate travel expenses of $432.72. Unfortunately for the petitioners, no greater amounts can be allowed for lack of sufficient substantiation. 5. Dividends. Respondent has determined that those expenses claimed by the corporation and disallowed by respondent constitute dividends to petitioner Leo Basile. For 1966 the respondent determined that the dividends received were in excess of the earnings and profits of the corporation for *40 that year. As we have indicated previously, the corporation was owned and controlled by Leo Basile. He was its operating head. He made all the decisions for the company. We cannot accept his claim that he was nothing more than a "mere employee" of the corporation owned by his son. The fact that the stock of the corporation had not been formally removed from the stock transfer book and physically handed to Leo is irrelevant. Leo testified that his salary was between $75 and $100 per week. His personal income tax returns for these years bear this out. There is no evidence showing that any other corporate payments to him were intended as salary income. Nor is there any evidence showing that the payments were treated as loans by the corporation to Leo. There is no clear line of demarcation between corporate funds and personal funds herein. Many of the expenses paid by the corporation were those of a personal nature to Leo Basile and his family. These payments made by the corporation for Leo's personal benefit constitute taxable dividend income to him. And, as dividends, the payments are not deductible as ordinary and necessary business expenses by the corporation. Challenge Manufacturing Co., 37 T.C. 650 (1962); *41 Electric & Neon, Inc., 56 T.C. 1324, 1340 (1971). To constitute dividend income such payments are not limited to luxurious accommodations or vacations, but may be for mundane items as car payments, insurance premiums and meals. Nor is the amount of the expenditure the determinative factor. Under these circumstances we hold that the unallowable deductions of the corporation for insurance premiums, purchases and travel expenses during the years in question are taxable as dividends to Leo Basile to the extent of the earnings and profits of the corporation. 6. Capital Gain. We have found the existence of a corporation owned and controlled by Leo Basile. During the three years in question the corporation made various expenditures on behalf of Leo. These were not made as compensation for services rendered. They must be treated as dividends to him. Section 301(c) of the Code provides: (c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount *42 constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount applied against basis.--That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount in excess of basis.-- (A) In general.--Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. Respondent has traced the dividend income to Leo Basile and seeks to establish its tax treatment. Respondent asserts that the basis of Leo's stock in the corporation was $2,300. This was the net value of the assets transferred by him to the corporation at the time of its formation. Leo does not dispute this. Therefore we accept respondent's determination. The payment by the corporation of certain expenses incurred by Leo was a result of his controlling interest therein. The assumption of his car payments, insurance premiums and certain meal expenses served to relieve him of his financial obligations. They *43 were not paid because of any debtor-creditor relationship or compensatory arrangement. See Gurtman v. United States, 237 F.Supp. 533 (D.N.J 1965), affirmed per curiam 353 F.2d 212 (C.A. 3, 1965). Those dividend payments in excess of the earnings and profits of the corporation must be applied in reduction of Leo's basis in the stock. The amount ($2,772.93) received by Leo that exceeds the earnings and profits of the corporation and his basis in the stock is taxable to him as a long-term capital gain. In view of the fact that the amounts here involved have been treated as dividends to Leo Basile, section 116 applies, thus permitting certain dividend exclusion. 7. Additions to Tax. The addition to tax provided for in section 6651(a) is applicable unless it is shown that the failure to file is due to reasonable cause and not wilful neglect. The burden of proof is on the petitioners. Rudolf A. Zivnuska, 33 T.C. 226, 239 (1959). No evidence was introduced by them to explain the reasons for the late filing of their Federal income *44 tax returns. The 1966 return was filed 15 months and 4 days late and the 1967 return was filed about 3 months late. In fact, over the past decade the petitioners have often been delinquent in filing their income tax returns. Consequently, we hold that Leo and Catherine Basile are liable for the additions to tax under section 6651(a) for the years 1966 and 1967. Likewise, no evidence was offered to explain why the corporation failed to file timely income tax returns for 1966 and 1967. Leo Basile, its chief operating officer, simply did not fulfill his responsibilities in this regard. There are no mitigating circumstances. It therefore follows that the corporation is liable for the additions to tax under section 6651(a). Respondent also determined that the corporation is liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations in the taxable years 1966, 1967 and 1968. Here again, the burden of proof is on the corporate petitioner and no evidence was introduced by it or through Leo Basile. However, respondent showed that the corporation did not maintain adequate books and records for the preparation and filing of its income *45 tax returns. The corporation was deficient in all aspects of its required record keeping. Therefore, the respondent's determination is sustained. To reflect the concession with respect to the dependency deduction for Peter and the conclusions reached herein on the disputed issues, Decisions will be entered under Rule 50.$ Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Petitioners have conceded the claimed dependency deductions for Peter.↩